Richard Sutton BUCK, V, by his father and next friend, Richard Sutton Buck, IV, and Richard Sutton Buck, IV, Individually, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 75–52–Civ–TH.

United States District Court, M. D. Florida.

May 13, 1977.

On Determination of Damages May 27, 1977.

Anthony W. Cunningham, Wagner, Cunningham, Vaughan & Genders, Tampa, Fla., for plaintiffs.

John E. Lund, U. S. Dept. of Justice, U. S. Atty., M. D. Fla., Tampa, Fla., for defendant.

ARONOVITZ, District Judge.

THIS CAUSE came on for trial before this Court, (a visiting judge), sitting without jury, in the Post Office Building at Tampa, Florida. Trial commenced on Tuesday, April 19, 1977, at 9:30 A.M., and concluded on Saturday, April 23, 1977, at 12:00 Noon. The Court has bifurcated the trial on the merits for the purpose of determination of the issue of liability.

At the outset of the trial and before its commencement there had been no bilateral Pretrial Stipulation filed herein because of a disagreement between counsel for the United States and counsel for the Plaintiffs. Upon discussion in open Court, counsel for the respective parties did agree to adopt pages 1, 2, 3 and that part of page 4 which is through paragraph 5 N, of the Proposed United States Pretrial Stipulation, and for the purposes of the said trial that this would be considered to be the Pretrial Stipulation in toto. The parties also in open Court further stipulated and agreed that the issues then remaining to be tried in the cause would be those issues framed by the Complaint and Answer. Further, it was stipulated and the parties through their counsel did agree to a bifurcation of the trial, thereby dividing the issues of liability and damages. This Court ordered such bifurcation and thereafter the issue for trial at that time was solely the question of the liability, if any, of the United States to the Plaintiffs.

Based upon the foregoing and particularly the record of the proceedings taken herein, having received and heard all of the testimony, expert and lay, carefully reviewed all of the exhibits introduced into evidence and heard argument by respective counsel, this Court makes the following findings of fact:

## FINDINGS OF FACT

1. That the Plaintiff, Richard Sutton Buck, IV, was a major in the United States Air Force stationed, however, at MacDill Air Force Base on May 9, 1972. That he and his family resided on base at the Air Force Installation. Richard Sutton Buck, V, son of Major Buck, who was 14 years of age at that time, while playing with a friend was bitten by a rattlesnake, in an area of the base commonly known as Rattlesnake Road. Sutton Buck recognized immediately that he had been bitten by a rattlesnake and having had some Boy Scout training, with the assistance of a friend, administered approved first-aid to himself according to his knowledge and training. This first-aid treatment has in no way been criticized by any other evidence in the cause and is not material except indicating to this Court that the young boy did everything which was reasonable in attempting to aid himself. That the young Plaintiff was brought to the emergency room of the MacDill Air Force Base Hospital by a military policeman who had been flagged down by Sutton Buck's friend and, in accordance with the testimony adduced, within approximately fifteen to twenty minutes after the snakebite occurred, the Plaintiff arrived at the emergency room of MacDill Air Force Base Hospital in the accompaniment of the Air policeman.

2. That when the boy was received at the emergency room of MacDill Air Force Base Hospital at about 6:15 P.M., May 9, 1972, he was accepted for treatment and was examined by the physician in charge of the emergency room, Captain (Dr.) Martone. At that point in time, Dr. Martone testified he accepted the history given by the boy of having been bitten by a rattlesnake. Dr. Martone having had no prior training in the treatment of snakebite, and no experience with care of such, undertook to consult by telephone with his superior, Major Koontz, a surgeon who was then off-duty. It appears that Major Koontz, likewise, had no experience in snakebite treatment and no training, therein, and both of the doctors, in the course of the conversation, so informed each other.

3. It is further the finding of this Court, that the admitting physician and/or his superior at or about the time of admission and during the period when the boy was in the emergency room, failed to seek consultation with a doctor or herpetologist who was or who were experienced in the means and methods of treatment of the condition from which Sutton Buck suffered, namely the bite of a large diamondback rattlesnake. That despite the fact that the admitting doctor had asked on a number of occasions and knew that in fact this was a bite by a large rattlesnake, neither the admitting doctor nor his superior made even the slightest attempt at outside consultation. Both the admitting physician, Dr. Martone, and his superior, Dr. Koontz, knew or should have known of the presence of Tampa General Hospital, a large general hospital (to which the boy was ultimately transferred 17 hours later) that from their training they knew or should have known had facilities for the treatment of poison victims at such hospital and that such hospital was less than ten minutes from the MacDill Air Force Base Hospital. Further, the admitting doctor, Dr. Martone, did not resort to reading any literature which was available at the base hospital library or any other literature or research to determine the manner to best treat a rattlesnake bite; that Dr. Martone acknowledged by his own statement that he knew this was a "potentially lethal situation" and that he assumed that Sutton Buck, V, had in fact been bitten by a diamondback rattlesnake. Dr. Martone had only a vague knowledge of treatment or of training in the treatment of snakebites by relying upon his memory from medical school.

4. This Court further finds that after telephonic consultation by and between Dr. Koontz and Dr. Martone, neither of whom had ever treated a snakebite or consulted upon one, they determined that their treatment of choice for Sutton Buck and his diamondback rattlesnake bite, was the use of antivenin. Such treatment was undertaken in the emergency room of MacDill Air Force Base by injecting Sutton Buck

with one ampule of antivenin *intramuscularly* in the buttock area; that while Sutton Buck was in the emergency room it appeared that he had an elevated pulse and blood pressure and that he had signs and symptoms of systemic involvement such as nausea, a mild discoloration and slight tenderness around the area reflected by two fang marks measured at approximately one inch apart on his left leg, slightly below the knee and to the left of the tibia, all corroborative of a bite by a large snake and that a related history by the patient was uncontroverted that he had been bitten by a large rattlesnake.

5. That with some supportive treatment, but without other treatment of significance for the snakebite, the boy was admitted to the hospital by transfer from its emergency room at approximately 8:15 P.M. and thereafter was attended exclusively by nurses or corpsmen until 3:45 A.M. the following morning. During this period of time there is a clear indication of progression of the signs and symptoms involving systemic symptoms and other manifestations of the seriousness of the rattlesnake bite of the Plaintiff. The Court further finds that both the testimony adduced and the medical records submitted indicate a clear progression of the signs and symptoms of the Plaintiff and the Court further finds that there was no observation by a physician of any sort, even Dr. Martone, who, although inexperienced, had endeavored to undertake to treat the Plaintiff, and that even Dr. Martone ignored and failed to observe the person of the Plaintiff from 8:15 in the evening until 3:45 A.M. the following morning. Further, the records reveal that the agents and employees of the Defendant knew of the progressively worsening condition of the Plaintiff during this period of time. The Court further finds that there was insufficient or inadequate care and attention during this period of time when such care and treatment was vital to have stopped the destructive aspects of the envenomization by the rattlesnake.

6. The Court further finds that in addition to the failure to observe and/or treat the person, that Dr. Martone and Dr. Koontz, having decided upon the use of antivenin as the treatment of choice, failed to follow the instructions in the drug manufacturer's package insert, Plaintiffs' Exhibit No. 9, accompanying the antivenin, even though this was the only literature that either one of the two physicians consulted for the first 14 hours of treatment of the person of the Plaintiff. At 3:45 A.M. Dr. Martone finally responded to urgent calls by the station nurse when the boy's left thigh was swollen half again its normal size, the leg above and below the knee had turned blue, and he had experienced nausea, all of which evidenced systemic involvement according to undisputed medical testimony. He thereupon examined the patient, improperly observed his signs and symptoms, or inadequately observed them, and further failed to give adequate care and treatment at that time, in that he again prescribed antivenin *intramuscularly* and again one-half hour later prescribed such antivenin *intramuscularly,* all of which was clearly contrary to the only literature which he had consulted, i. e. that of the package insert, Plaintiffs' Exhibit No. 9, (both as to quantity and method of administering same); that Dr. Martone did not further observe the person of the Plaintiff until 7:00 A.M. in the morning and then failed at that time to prescribe any care and/or treatment. All of this happened despite the signs obviously indicative of care which was never rendered to the boy, then merely passing it off upon his superior who would be on the scene sometime early in the morning hours. There was a failure between the two physicians, Dr. Koontz and Dr. Martone, to confer during that morning and for that matter at any time during the night when the boy's condition was progressively deteriorating, except for one telephone call around 3:30 A.M. between the two doctors without again agreeing to seek expert opinion and provide adequate treatment of antivenin. It would have been apparent to even a layman that the boy was in a serious and compromisingly lethal situation during these hours.

7. That Dr. Koontz's treatment, according to the records, for the *first* time prescribed antivenin, though in an *inadequate* amount, in at least the method recommended by the antivenin literature—*intravenously.* This was done, however, only after some fourteen or fifteen hours of improper, inadequate, unreliable and grossly neglectful treatment.

8. The Court finds additionally that there was testimony which this Court finds credible and worthy of belief, that by the time the boy was to be transferred or actually arrived at Tampa General Hospital at or about 11:30 A.M., May 10, 1972, his condition, at that point was really a matter of whether or not his life could be saved. And it appears from the early entries in the Tampa General Hospital records, Plaintiff's Exhibit 6, that his diagnosis at or around the time of arrival, was "acutely" ill. And thereupon, the Court finds that the progression that accompanied this was not watched or observed sufficiently and countered with reasonable care.

9. That the Court finds as a matter of fact that all damages to the person of the Plaintiff were complete at the time that he was admitted to Tampa General Hospital at approximately 11:30 A.M. on May 10, 1972.

10. This Court further finds that not only was there negligence in the *initial treatment* and *failure to consult in the emergency room* by the physicians, Martone and Koontz, but that such negligent failure to consult and to properly treat was *compounded* at various times throughout the night of May 9th and early morning hours of May 10th, as the condition of Sutton Buck, V, progressed. It is abundantly clear that even if initially such consultation might not have been sought, it certainly became overwhelmingly indicated as the night and Sutton Buck's symptoms progressed. Such delay of 14 hours after the admission to the hospital before consultation was made is in this Court's opinion grossly negligent. This Court finds that there was sufficient progressive signs of worsening in the condition of this young man during those hours that such consulta-tion was demanded and that failure to obtain such consultation was, is, and does constitute negligence within the meaning of the law of the State of Florida.

11. That the physicians, Koontz and Martone, having elected to use a recognized and proper form of treatment for the snakebite by the use of antivenin, it appears that there was clear negligence in the *failure* of such physicians *to adequately follow the instructions* contained with such medication and that failure to follow such instructions when they were the only instructions available when, in fact, they were the only instructions consulted is clearly a departure from reasonable medical care of the person of the Plaintiff. Again, this failure not only occurred initially in the treatment rendered in the emergency room, but was compounded throughout the night by repeated failure to properly administer sufficient antivenin and in proper manner as the boy's condition progressively worsened.

12. The Court observes that although there was at the time of this incident a difference of opinion among experts as to the possible methods of treatment for pit-viper bites, such as the diamond-back rattlesnake, some advocated antivenin while others advocated fasciotomy coupled with some reduced administration of antivenin. Notwithstanding the controversy or difference of opinions over the methods of treatment, it clearly appears here that the doctors in charge undertook to apply a specific form of treatment, i. e. that of antivenin and supportive treatment. According to the standards in Florida as evidenced by the documentation submitted in this case, 90% of the physicians in Florida apparently resorted to the use of antivenin in the treatment of snakebite and, therefore, it was a proper method and treatment of choice by the physicians. However, this Court finds as a matter of fact that Drs. Martone and Koontz, having adopted the standard which was acceptable, thereafter failed to exercise a reasonable degree of skill and care required in the administration of that method of treatment with antivenin and that such

failure to use reasonable care was a departure from and a falling below the standard of care of physicians in the area and specifically of treating physicians of similar training and experience in the area. This same failure to meet the standards applied to the lack of expert consultation, something which the expert witnesses testified was part of the normal standard of care and practice for use by and was used by physicians in the area who lacked training or expertise in treating snakebites.

13. Therefore, the Court further finds that the failure to observe this young man by Dr. Martone between the hours of 8:15 P.M. and 3:45 A.M. is negligence within the definition prescribed by the law of the State of Florida. Here again the expert testimony which this Court accepts as credible indicates that "close" observation should be maintained of a snakebite victim during the first 12 hours. Here, this prescribed standard of care was never even close to being observed or practiced.

14. That the failures of Drs. Martone and Koontz to administer antivenin in the amounts called for and according to the method described in the literature accompanying the antivenin is negligence.

15. The failure to call for consultation from the time in the emergency room until his transfer the following morning some 14 hours later by Dr. Koontz and Dr. Martone, or to seek other information, or advice, in that situation is negligence.

16. The Court finds and acknowledges that a rattlesnake bite in and of itself is a serious occurrence and that it is a potentially lethal event; however, this Court further finds that the issue in this cause is whether or not the standard of care was met by the care which was administered to this snakebite victim at the time he presented himself for treatment at MacDill Air Force Hospital and during his stay at MacDill Air Force Base Hospital and whether that care met the standards of the community in accordance with the law of the State of Florida. This Court finds that as a matter of fact, it did not.

17. There have been many expert witnesses appearing in this matter. Drs. Findlay Russell and L. H. S. Van Mierop for the Plaintiff, and this Court shall not dwell on the qualifications of any of these physicians as they are clearly apparent in the record. For the Defendant in the order of their appearance, Dr. Klebanoff, Dr. Andrews, Dr. Lockhart, Dr. Glass, Dr. Williams; again the Court will not dwell on the qualifications of these physicians. This Court deems it of importance to note, however, that of the experts presented by the Defendant, only one physician, Dr. Andrews, was from the State of Florida and that Dr. Andrews, after cross-examination by counsel for the Plaintiff, acknowledged and admitted, reversing his initial opinion by stating that the use of the antivenin by Drs. Koontz and Martone in the quantities given and in the manner administered did not meet the standard of care.

18. The Court has carefully weighed the testimony of all the experts and finds that the testimony and evidence of the Plaintiffs' experts are infinitely more credible than those afforded by the Defendant in terms of opinions regarding the standard of care and treatment and the degree of skill and care which was rendered to the patient, Richard Sutton Buck, in these circumstances.

19. This Court is of the opinion that the greater weight of the evidence and the more convincing force and effect of the entire evidence indicated negligence in the matter of the treatment of Sutton Buck, V, by the agents, servants or employees of the Defendant, United States of America. More so, this Court observes and finds that the weight of the evidence far exceeds the burden of proof imposed upon Plaintiffs to establish liability in favor of their position in this cause; that is, that the failure of the agents, servants, or employees of the United States to consult, the failure to observe, and the failure to properly treat the person of the Plaintiff, Richard Sutton Buck, V, compounded by continuing acts of further negligence of the same acts or failure to act, in the Court's opinion amounts to a grossly inadequate, inept, improper, and

even uncaring treatment tantamount to a grossly negligent situation.

## CONCLUSIONS OF LAW

THEREUPON, the Court reaches the following conclusions of law:

(1) This cause of action arose pursuant to the Federal Tort Claims Act U.S.C.A., sections 1346(b) and 2671 et seq.

■ (2) In accordance with the provisions of 28 U.S.C.A., section 1346(b), the United States would be liable in a Tort Claims Act case under circumstances where a private person would be liable according to the law in the State of Florida.

(3) That the Plaintiffs have alleged, in substance, that agents of the United States, namely doctors, then in attendance at the MacDill Air Force Base Hospital were negligent in their performance of medical attention rendered to the Plaintiff, Richard Sutton Buck, V, at the time he presented himself for treatment and thereafter until he was transferred to Tampa General Hospital.

(4) In this case, this Court concludes as a matter of law that while Drs. Martone and Koontz may have selected a method recognized as acceptable, by selecting the use of antivenin in the treatment of rattlesnake bite, that the treatment rendered did not follow that prescribed method and in rendering that treatment that such physicians did not use the ordinary skill of physicians, which physicians with their background and training should have used, and that they failed to use reasonable care and were negligent in their care and treatment of the Plaintiff under the law of the State of Florida.

(5) The Court further finds as a conclusion of law that the injuries which the Plaintiff has suffered were the proximate result of the negligence of the agents, servants or employees of the United States and that as such the Defendant, United States of America, is responsible for all of the injuries flowing from and stemming out of said negligence of the Defendant.

(6) That the Court further finds as a conclusion of law that the Defendant's agents, servants or employees of the United States were clearly negligent in the care and treatment of the person of the Plaintiff, Richard Sutton Buck, V, in their failure to properly consult, observe and treat him in the environs of MacDill Air Force Base Hospital during his stay there and that such negligence was a proximate cause of the loss, injury or damage of the Plaintiff, Richard Sutton Buck, V, and of his father, Richard Sutton Buck, IV.

(7) Plaintiffs have submitted appropriate claim form under the Tort Claims Act as previously adjudicated in this cause; and the United States is liable for all of the loss, injury or damage arising to the claimants as a direct and proximate result of the negligence of Defendant's agents and employees.

(8) It is further the conclusion of law of this Court that based on the aforegoing findings of fact, that it was clear to this Court that the actions of the agents, servants, or employees of the Defendant, The United States Government, failed to use reasonable care; that they failed to use that degree of skill and care which is generally used in similar cases and circumstances by physicians and/or hospitals in communities, having similar medical standards and available facilities, Florida Standard Jury Instruction 4.2. Further, that the agents, servants, or employees of the Defendant did not deliver to the Plaintiff that care and treatment that physicians of ordinary skill, care, and diligence practicing at the same time and in the same general area and the same specialty would have done in like or similar circumstances. And further, that they failed to do those things that a physician of ordinary care, skill and diligence would have done and should have done in like or similar circumstances, *Brooks v. Serrano*, 209 So.2d 279 (Fla. D.C.A. 4, 1968); *Lab v. Hall*, 200 So.2d 556 (Fla. D.C.A. 4, 1967); *Brown v. Swindal*, 121 So.2d 38 (Fla. D.C.A. 1, 1960); *Hickman v. Employers Fire Insurance Company*, 311 So.2d 778 (Fla. D.C.A. 4, 1975).

(9) Thereupon judgment as to liability shall be entered hereon for the Plaintiffs over and against the Defendant. Trial shall be held herein at a subsequent date on the issue of damages.

## ON DETERMINATION OF DAMAGES

THIS CASE presented a claim by the plaintiffs under the Federal Tort Claims Act and as noted in an earlier Memorandum Opinion containing Findings of Fact and Conclusions of Law entered by this Court, the trial was bifurcated and heard initially on the issue of liability as to which the aforesaid Memorandum Opinion was addressed.

Having found liability in favor of the plaintiffs and against the defendant, this Court under date of May 5 and May 6, 1977 sat in a non-jury trial to hear the testimony presented and evidence adduced as well as oral argument by all parties relating to the issue of damages. Based upon the aforegoing as well as a complete re-examination of the Court record and the study of memoranda of law submitted by the respective parties on the issue of damages, this Court herewith makes the following findings of fact, to-wit:

## FINDINGS OF FACT

1. As a direct and proximate result of the inadequate and negligent medical care afforded to plaintiff, RICHARD SUTTON BUCK, V, at MacDill Air Force Base Hospital for treatment of a rattlesnake bite occurring on or about May 9, 1972, he was a patient for about six weeks in Tampa General Hospital, Tampa, Florida. He has undergone a tendon transplant at the University of Virginia Medical Hospital, Charlottesville, Virginia in an effort to restore the damage to a dropped left foot and has spent approximately five months at Westbrook Mental Hospital, Richmond, Virginia for psychiatric treatment necessitated by his traumatic reaction to the severe snakebite injury and resultant inadequate and negligent treatment thereof.

2. Further, the inadequate and negligent medical care at MacDill Air Force Base Hospital has resulted in Richard Sutton Buck, V, sustaining a deformity in the left lower leg evidenced by a deep, scarred wound approximately two (2) inches in breadth, commencing slightly below the left knee and to the left thereof, extending down the leg approximately twelve (12) inches to a point just above the left ankle. According to medical testimony he experiences weakness and difficulty in the muscles of the left leg and ankle, numbness on the exterior of the left leg below the knee, a clawing of the toes of the left foot, all of which contribute to and result in a dropped foot evidencing itself by a stepped gait.

3. Additionally, medical testimony establishes that his lumbar spine area is slanted to the left in the form of a list which reflects a ⅜th inch to ½ inch drop of the pelvic girdle, causing the left leg to be shorter than the right by the amount indicated. It is also observed that he experiences an inequality of the flankfolds. The left leg is already experiencing some atrophy.

4. Testimony established that with advancing age, there will be abnormality in the wear of the two legs, that arthritic involvement will occur and progressively increase and eventually sciatica will occur.

5. The aforegoing establishes the present and likely future status of the damaged leg but it should be noted that while he was in Tampa General Hospital this plaintiff underwent a fasciotomy of the left leg as a result of which surgical procedure his entire leg from just below the left knee to slightly above the left ankle was laid open and several debridements were performed thereon. Later, he used crutches for about two months to assist him in walking. Photographs in evidence speak more graphically of the nature and extent of this situation and experience than this Opinion can describe by words.

6. Approximately eight (8) months following the incident an effort was undertaken through a surgical procedure at the University of Virginia Medical School, Charlottesville, Virginia, for which he was

hospitalized for five weeks to correct the dropped foot but, unfortunately, the result succeeded only for a short period of time and thereafter the foot returned to its former status without any apparent relief so that the plaintiff can only move his foot downward but is unable to lift it upward.

7. Plaintiff wears a foot brace extending from slightly below the knee to the foot most of the time during the day and, additionally, uses Ace bandages to wrap the entire leg below the knee. He does this to protect the scarred area which is still sensitive, and injury prone, as well as from a sense of embarrassment at the ugly disfigurement which is reflected without the covering. Notwithstanding this it should be noted that he can walk without the brace and to a limited extent can even run but certainly not in a normal way, nor can he fully participate in sports usually engaged in by young people during a normal juvenile life.

8. There was a conflict in the testimony as to whether or not Plaintiff's confinement at Westbrook Sanitarium was related to the injury and the resultant treatment, which are the subject matter of this litigation. It appears that the young man's parents and he had experienced some parental problems but not excessively so prior to the snakebite incident and although he was not in full accord with views of his parents, it does not appear that he was recalcitrant or rebellious nor was he in any way a youth who approximated a description as a juvenile delinquent.

9. After careful consideration and weighing the conflicting testimony, both lay and expert, the Court finds that the boy's confinement at Westbrook Sanitarium for five (5) months was caused by and resulted from the physical wound experienced by the plaintiff through the medical and negligent treatment received from the defendant's agents at MacDill Air Force Base Hospital. This was the primary and contributing cause in the nature of a severe, traumatic experience suffered by a 14-year old boy which physically exposed him to substantial hospitalization, medical treatment, handicapped activity, resultant embarrassment and a feeling of inequality derived therefrom as to his potential relations with members of the opposite sex, all of which affected him psychologically.

10. This Court also finds from the medical testimony adduced that the plaintiff will undoubtedly have to confine his future occupational activity to a sedentary occupation. However, this apparently poses no particular problem since he is a very bright student currently averaging 3.6 grade level at the University of Maryland. That is almost a straight A average and his intentions heretofore and continuing at this time are to enter the field of journalism.

11. The Government offered no expert testimony on the subject of the medical prognosis for the plaintiff. The testimony offered by the plaintiffs would seem to indicate that there are four (4) surgical procedures which are likely to be required, i. e. some or all (depending upon circumstances) at some point during this young man's life. These are:

(a) *Triple arthrodesis of left foot.* Four surgeries, five days in the hospital at $125.00 per day; a surgical fee of $600.00; and anesthetist's fee of $200.00.

(b) *Tendon Transplant.* Seven days hospitalization at $125.00 per day; a $600.00 surgical fee; and a $200.00 anesthetist's fee.

(c) *The Back Fusion.* A minimum of three weeks at $125.00 per day; a fee of $1,200.00 to the surgeon; and the anesthesiologist's fee of $200.00; for a total of $4,025.00.

(d) *Plastic Surgery.* Eight weeks hospitalization at $125.00 per day, or $7,950.00; the surgeon's fee of $750.00; and the anesthesiologist's fee of $200.00 for a total of $8,900.00.

The young man's father has the benefit of a government insurance program known as CHAMPUS and the benefits thereof have heretofore been the means for payment of virtually all expenses thus far incurred. CHAMPUS will be available to this young man until he reaches the age of

twenty-one so long as he is a full time student. Therefore, to the extent that it is available, the government should receive the benefit of the reduced cost of such procedures as may be reasonably expected could be undertaken during the two-year period before the young man reaches the age of twenty-one. By reason of the fact that each of the procedures is rather extensive, medical testimony indicates that it is unlikely, that more than the first surgical procedure above described would be undertaken prior to his attaining the age of twenty-one.

12. The matter of determining damages to be awarded is based upon the sound judgment and discretion of the trier of the facts so long as there is a proper foundation and basis in the evidence and in the law for the award. It is the finding of this Court that in terms of Past Damages, the plaintiff, Richard Sutton Buck, V, should be awarded for Pain and Suffering the sum of $25,000.00; for Disfigurement the sum of Ten Thousand Dollars ($10,-000.00); for Inability to Follow a normal life the sum of Ten Thousand Dollars ($10,-000.00); and for Mental Pain and Anguish Twenty Thousand Dollars ($20,000.00), thus totaling Sixty-five Thousand Dollars ($65,-000.00) for Past Damages.

13. In the area of Future Medical Damages, this Court is convinced that the plaintiff should be awarded such sums of money as would reasonably allow for all four (4) surgical procedures at some point during his lifetime even though the exact time or, for that matter, whether or not any one of such procedures may or may not be undertaken for medical reason or otherwise. Therefore, based upon the medical testimony adduced as to the costs of these four (4) surgical procedures, after giving effect to such allowances as may be paid by CHAMPUS up to age twenty-one (21), and calculating and including in addition to the surgical procedures psychiatric treatment as recommended for a period of two to three years, costs and supplies such as orthopaedic shoes, a foot brace (including replacements as to both), regular quarterly medical examinations and Ace bandages, to which wherever applicable the Court has applied a factor of 4% over a 51.3 year life expectancy to arrive at present monetary value, the Court finds that compensable future medical expenses at present money value in the aggregate amount of Twenty Thousand Dollars ($20,000.00) should be granted to the plaintiff.

14. With regard to Future Damages, (other than Medical), the Court finds that for the experiences relating to the four (4) future surgeries, attendant pain and suffering, difficulties and sickness, that the plaintiff, Richard Sutton Buck, V, should receive damages in the sum of Twenty Thousand Dollars ($20,000.00); and for Disfigurement, Inability to Lead a Normal Life and Mental Pain and Anguish, this Court finds that a reasonable allowance of compensation, therefore, would be the sum of Eighty Thousand Dollars ($80,000.00), thereby aggregating Future Damages at present money value in the sum (where applicable) of One Hundred Thousand Dollars ($100,-000.00).

15. The Court has taken into consideration the medical testimony which indicates that the different methods or types of plastic surgery available to the plaintiff are each unusual, painful and prolonged in terms of their treatment and, further, there may not be a determination by the plaintiff to undergo this very severe surgical procedure. Nevertheless, he should be provided the financial means to do so if he chooses to suffer the experience that would attend the surgical procedure.

16. In summary, therefore, this Court finds that the total sum which should be awarded to Richard Sutton Buck, V, plaintiff, is the aggregate sum of One Hundred Eighty-five Thousand Dollars ($185,000.00), constituting Sixty-five Thousand Dollars ($65,000.00) in Past Damages; One Hundred Thousand Dollars ($100,000.00) in Future Damages (other than Medical) and Twenty Thousand Dollars ($20,000.00) in Future Medical Damages and Expenses.

17. With respect to the plaintiff, Major Richard Sutton Buck, IV, this Court finds

that most of those monies which he would have normally expended in behalf of his son were paid by CHAMPUS, this being estimated at approximately Thirteen Thousand Dollars ($13,000.00). Major Buck paid out-of-pocket expenses to Westbrook Psychiatric Hospital, uncovered CHAMPUS expenses, and travel to and from hospital, as well as a special tutor in mathematics for his son, aggregating Four Hundred Fifty Dollars ($450.00). This Court finds that Major Richard Sutton Buck, IV, should be awarded the sum of Four Hundred Fifty Dollars ($450.00) as damages.

## CONCLUSIONS OF LAW

1. Under applicable Florida law, Plaintiff, RICHARD SUTTON BUCK, V, is entitled to recover as compensation for the injuries sustained by him as a direct and proximate result of the negligence of the defendant, past damages (including pain and suffering, disfigurement, inability to follow normal life and mental pain and anguish); future medical and future non-medical damages (including pain and suffering, disfigurement, inability to lead normal life, and mental pain and anguish). *See generally* 9A Fla.Jur. Damages, and cases cited therein.

2. Plaintiff, RICHARD SUTTON BUCK, IV, is likewise entitled to receive compensatory damages sustained by him as a result of the defendant's negligence. *Id.*

3. Thereupon, this Court adopts as a Conclusion of Law an award finding in behalf of RICHARD SUTTON BUCK, V, Plaintiff, in the sum of One Hundred Eighty-Five Thousand Dollars ($185,000.00), and in behalf of MAJOR RICHARD SUTTON BUCK, IV, Plaintiff, in the sum of Four Hundred Fifty Dollars ($450.00).

4. A final judgment shall be entered simultaneously herewith, pursuant hereto.