## 61252. HAWKINS et al. v. GREENBERG.

Pope, Judge.

Mrs. Hawkins and her husband sued Dr. Greenberg for medical malpractice in negligently prescribing medication for her containing sulfa when he knew at the time she was allergic to sulfa drugs and which caused her to suffer anaphylactic shock, schizophrenia and other severe and debilitating reactions from which she has never completely recovered. Mr. and Mrs. Hawkins sought damages in the amount of $10,000.00 as reasonable compensation for past, present and future injuries, damages and expenses and loss of Mrs. Hawkins' services to Mr. Hawkins. Prior to trial the manufacturer of the drug and the pharmacy which supplied it to Mrs. Hawkins were removed as codefendants on motion for summary judgment. *Hawkins v. Richardson-Merrell,* 147 Ga. App. 481 (249 SE2d 286) (1978). At trial the testimony of seven doctors who had treated Mrs. Hawkins both before and after her allergic reaction, including the defendant, was presented by the plaintiffs. Expert testimony of a doctor from California as to the proper standard of care exercised by the medical profession generally, and his opinion as to the standard of care exercised by Dr. Greenberg in the instant case also was presented. The jury found for the defendant and this appeal is from the judgment on that verdict.

1. Since Dr. Greenberg testified under cross examination that he knew the drug he prescribed contained sulfa, that it should not be given to one allergic to sulfa drugs, that he did not tell Mrs. Hawkins it contained sulfa nor ask her if she was allergic to any drugs, and that because there was further uncontroverted evidence that this drug was the cause of Mrs. Hawkins' anaphylactic shock and ensuing medical and mental problems, appellants contend that they were entitled to the grant of their motion for directed verdict or for judgment notwithstanding the verdict.

The only major conflict in the evidence presented here is the exact time at which Mrs. Hawkins became aware that she was allergic to sulfa drugs. Mrs. Hawkins had been treated by Dr. Ernest W.

Abernathy, a general practitioner since 1970. In 1972 Dr. Abernathy referred Mrs. Hawkins to Dr. Alexis Davison, an internist specializing in allergies, for her particular allergic problems. When asked routinely by Dr. Davison if she had any known drug allergy problems, Mrs. Hawkins "responded at that time that she had a reaction after taking sulfa preparation by mouth in 1972." After testing Mrs. Hawkins and discovering that she was allergic to a large number of substances, Dr. Davison put her on a regimen of certain dietary restrictions and a series of desensitization injections which were administered once or twice weekly in Dr. Abernathy's office for convenience. Dr. Greenberg was Mrs. Hawkins' gynecologist and saw her for regular checkups once or twice a year from 1969 to 1974. During this same period she was also treated by Dr. Thomas W. Busey, a urologist, for bladder infection. The medical records of all the doctors except defendant Greenberg contain notations prior to 1974 that Mrs. Hawkins had a known allergy to sulfa drugs, and these doctors testified that they would never prescribe any sulfa drug for her. Defendant Greenberg's records had only one reference to Mrs. Hawkins' allergies, dated November 8, 1973, in which it was stated that she had "no drug allergies." However, Mrs. Hawkins testified that after she suffered an allergic reaction to sulfa drugs in October of 1972, she so informed Dr. Greenberg.

The evidence is undisputed that on September 9, 1974 Mrs. Hawkins went to Dr. Greenberg for a routine gynecological checkup, at which time Dr. Greenberg gave her a prescription for AVC vaginal suppositories, a medication containing sulfa. Dr. Greenberg did not ask Mrs. Hawkins if she was allergic to sulfa drugs although he knew the product contained sulfa. Mrs. Hawkins had the prescription filled on September 15. Neither the label nor the packaging of the medication revealed that it contained sulfa, nor was this fact communicated to Mrs. Hawkins by the pharmacist. That evening at bedtime Mrs. Hawkins inserted one of the suppositories and slept through the night. The next morning when she awoke she felt "weak and jittery," but went to Dr. Abernathy's office as scheduled for her regular desensitization injection. At about 2:30 that afternoon she felt weaker and noticed red splotches on her legs. When her husband came home from work about an hour later and could care for their baby, she drove to Dr. Abernathy's office where she suffered an acute anaphylactic allergic reaction resulting in total loss of blood pressure, epileptic-type seizures and laryngospasms with a heart rate of 140 beats per minute. Dr. Abernathy administered emergency care. Mrs. Hawkins was hospitalized for a prolonged period during and subsequent to which she was treated by two other medical specialists for physical complications and by a psychiatrist who diagnosed her

mental condition as "acute schizophrenic episode and psychosis with drug intoxication" caused by her allergy to sulfa drugs. Mrs. Hawkins is still unable to work at her profession of cosmetology and has suffered possible permanent injury to the central nervous system of her brain from the total loss of blood pressure. Although Mrs. Hawkins was taking other prescription medication at the time of the allergic reaction, the medical witnesses were unanimous in the opinion that the anaphylactic shock episode could only have been triggered by the AVC suppositories containing sulfa.

Dr. Abernathy and Dr. Ellenhorn (a California physician who has frequently been an expert witness in medical malpractice suits) both testified that the degree of reasonable care exercised by the medical profession generally is to ask a patient at the time of prescribing a drug if they are allergic to any drugs. As stated by Dr. Ellenhorn: "First, a doctor who has not seen a patient for over a year would ask the patient a few general questions with regard to their experiences, how have you been doing in the past year, have you been out of the city, have you been to any other doctors, have you received any medications from anybody, anything that I should know about what has been happening to you since I saw you last. These are ordinary questions that a doctor would ask in his office. And then he would proceed to give the medication only after he was assured himself that the patient had not developed any allergies, such as to sulfa drugs and penicillin and other drugs which have been known for years . . . to have a high incidence of producing allergic reactions. They are good drugs, they are useful drugs, but they must be used with great care . . . Dr. Greenberg failed to exercise these type of questions of the patient."

Dr. Abernathy testified that he "always ask[s] with each prescription on each visit no matter how many times they have been in" if his patients have any allergies to any drugs, and that he always makes a note of it in the patient's medical records so that he would not overlook this information and prescribe such a product. When asked how it was determined whether a person had an allergy to a drug, Dr. Davison (the allergy specialist) replied that it could only be learned in retrospect: "You need to ask someone have they ever had any type reaction to a drug . . . in general, and to any specific drugs, if you want to know; we really cannot predict who is going to have an allergic reaction to a drug."

"To establish professional medical negligence the evidence presented by the patient must show a violation of the degree of care and skill required of a physician. Code Ann. § 84-924. Such standard of care is that which, under similar conditions and like circumstances, is ordinarily employed by the medical profession generally. [Cits.]

There is a presumption that medical or surgical services were performed in an ordinary skillful manner and the burden is on the plaintiff to show failure to exercise due care and skill. [Cits.] Excepting in a few extreme circumstances, the question of compliance with the required standards must be presented through expert testimony." *Kenney v. Piedmont Hospital,* 136 Ga. App. 660, 664, (222 SE2d 162) (1975). "A directed verdict is authorized where there is no conflict in the evidence and the verdict is demanded. [Cit.] The mere existence of conflicts in the evidence does not render the direction of a verdict erroneous if it was demanded either from proof or lack of proof on the controlling issue." *Slack v. Moorhead,* 152 Ga. App. 68, 71-72 (262 SE2d 186) (1979).

The plaintiffs here offered the opinions of seven independent medical experts while the defendant presented no explanation of his conduct nor medical evidence to rebut the standard of care generally exercised by the medical profession as established by the uncontradicted testimony of the plaintiffs' experts. We perceive this to be a case in which the plaintiffs' experts have "demonstrate[d] to the jury a deviation from the recognized and accepted standard of medical care prevalent in the general professional community for treating a patient with the signs and symptoms exhibited by the plaintiff" so as to rebut the presumption that the defendant's medical services were performed with the requisite degree of skill or care. *Smith v. Luckett,* 155 Ga. App. 640, 641 (271 SE2d 891) (1980). This court's ruling in *Slack v. Moorhead,* supra, that a directed verdict is authorized in a medical malpractice action "if it was demanded either from proof or lack of proof on the controlling issue" makes no distinction in application between plaintiffs and defendants (although the defendant prevailed in that case). However, in light of the Supreme Court decision in *Howard v. Walker,* 242 Ga. 406 (249 SE2d 45) (1978), we conclude that a directed verdict in favor of the plaintiffs cannot be sustained.

In *Shea v. Phillips,* 213 Ga. 269, 271 (98 SE2d 552) (1957), it was established that the burden is on the plaintiff patient in a suit against his physician to show a lack of due care, skill or diligence and that the proof required to overcome such burden can only be shown through the opinion evidence of medical experts. (" 'As the physician ought to be judged by the physician, so ought men to be judged by their peers.' ") Subsequently, in *Ginn v. Morgan,* 225 Ga. 192 (167 SE2d 393) (1969), the Supreme Court "reach[ed] the solid conclusion that a summary judgment can never issue based solely upon opinion evidence." Then in *Howard v. Walker,* supra, at 407, (a medical malpractice action), the Supreme Court stated in reversing this court that while *Ginn* is "[t]he seminal case in Georgia regarding opinion

evidence in summary judgment cases . . . [t]hat decision did not consider the differences between cases in which opinions of nonexperts are admissible (as there) versus cases in which only opinions of experts are admissible (as here), and did not consider differences between cases in which expert opinions are admissible but not essential (as there) versus cases in which at least one expert's opinion is mandatory (as here)."

*Howard* held that summary judgment may be granted to the defendant "in those cases where the plaintiff must produce an expert's opinion in order to prevail at trial when the defendant produces an expert's opinion in his favor on motion for summary judgment and the plaintiff fails to produce a contrary expert opinion in opposition to that motion." Id. at 408. The court added the caveat, however, that *"Ginn v. Morgan,* supra, and its progeny continue to be correct insofar as . . . motions for summary judgment in favor of plaintiffs are concerned." Ibid.

We are cognizant that there are differences in evidentiary requirements between motions for summary judgment and motions for directed verdict. See generally Davis & Shulman, Ga. Prac. & Proc. §§ 9-10, 13-6 (4th Ed.). While in both motions the moving party has the burden of showing that the opposite party has not presented sufficient evidence to authorize a jury to find in his favor, a ruling in favor of a movant for summary judgment is a more far-reaching determination. Thus, notwithstanding the greater exactitude demanded in summary judgment proceedings, we surmise that the presumption in favor of the physician's use of due care and skill, coupled with the *Ginn-Howard* rationale that a *plaintiff's* motion for summary judgment cannot be sustained purely on the basis of opinion evidence in a malpractice action, mandates the submission of the controlling issue to the jury even where the defendant fails to meet his evidentiary burden and that the direction of a verdict in such cases can likewise never be correct.

The quandary in either instance, as astutely noted by then Judge, now Justice, Smith in *Skinner v. Coleman-Nincic Urology Clinic,* 156 Ga. App. 638 n. 1 (275 SE2d 724) (1981), is the difficulty in reconciling the "ruling in *Howard* with the well-established rule that an expert opinion 'is [not] so authoritative that the Jury are bound to be governed by it.' *Choice v. State,* 31 Ga. 424, 425 (1860) . . . Perhaps there is an implicit holding in *Howard* that unimpeached, uncontroverted expert opinion testimony produced in cases 'where the plaintiff must produce an expert's opinion in order to prevail at trial' [i.e., medical malpractice actions] stands generally on the same footing as unimpeached, uncontroverted factual testimony and 'cannot be arbitrarily disregarded by the trier of facts . . . ' *Nesbit v.*

*Nesbit,* 241 Ga. 351, 352 (245 SE2d 303) (1978) . . . However, the majority in *Howard* at p. 408 appears to reject this analysis . . . Under an evidentiary rule whereby uncontroverted expert opinion testimony cannot be disregarded by a jury (or a judge), no rational distinction can be drawn, as the Supreme Court draws, between a plaintiff's and a defendant's expert witness. Thus, it would appear that *Howard v. Walker,* supra, is based on a more elusive rational."

Nevertheless, we are bound by the holdings of the Supreme Court and, for the reasons above stated, having interpreted *Howard v. Walker* to apply to motions for directed verdict by the plaintiff in a medical malpractice action, we therefore uphold the denial of plaintiffs' motions in the instant case.

2. In any event, this case must be reversed because instructions given to the jury by the trial court, particularly as to assumption of the risk by Mrs. Hawkins, were so inappropriate and prejudicial as to effectively remove the determination of the controlling issue from the jury. The following charges were given and objected to by appellants:

"I charge you that every person has a duty to exercise ordinary care for his or her own safety. If you should determine from the evidence that the plaintiff failed to exercise ordinary care for her own safety and that this failure on her part was the proximate cause of her injuries, she could not recover.

"If the plaintiff by the exercise of ordinary care could have avoided the consequences to herself caused by the defendant's negligence, the plaintiff is not entitled to recover. However, the plaintiff's duty to exercise ordinary care to avoid the consequences of the defendant's negligence does not arise until the defendant's negligence exists, and the plaintiff knew, or in the exercise of ordinary care should have known of such negligence.

"When a person knowingly and voluntarily takes a risk of physical injury, the danger of which is so obvious that the act of taking such risk, in and of itself, amount[s] to a failure to exercise ordinary care and diligence for her own safety, she cannot hold another liable for injuries proximately caused by such action even though the injuries may be in part attributable to the negligence of such other person.

"In the absence of anything to the contrary, every adult is presumed to possess ordinary intelligence, judgment, and discretion. Certainly, a person cannot heedlessly rush into the grave peril of the existence of which [she] is perfectly aware, and then hold anyone else, whether negligent or not, responsible for the consequences. If you find the defendant was negligent, and you further find there was negligence on the part of the plaintiff proximately causing or

contributing to the plaintiff's injury and damages and that such negligence of the plaintiff was equal to or greater than that of the defendant, then the plaintiff cannot recover.

"If you find there was such negligence of the defendant as to make the defendant liable to plaintiff and you further find there was some negligence on the part of the plaintiff contributing to [her] injury and damage, but such negligence of the plaintiff was less than defendant's negligence, then I instruct you that this negligence on the part of the plaintiff would not prevent [her] recovery of damages in this case, but would require that you reduce the amount of damages which would otherwise be awarded to the plaintiff in proportion to the negligence of the plaintiff compared with that of the defendant.

"I charge you that for his or her own safety, a patient must exercise ordinary care to give an accurate history to her treating physician. If the patient is aware that the physician is unaware of some aspect of the patient's medical history which may involve risk of harm to the patient, then ordinary care requires that the patient volunteer the additional information to the treating physician. If the patient fails to make such disclosure, she may be deemed to have voluntarily and unreasonably encountered a known risk."

"[T]he doctrine of assumption of the risk of danger applies only where the plaintiff, with a full appreciation of the danger involved and without restriction from his freedom of choice, either by the circumstances or by coercion, deliberately chooses an obviously perilous course of conduct so that it can be said as a matter of law he has assumed all risk of injury." *Myers v. Boleman,* 151 Ga. App. 506, 509 (260 SE2d 359) (1979). This doctrine has absolutely no application to a situation where, as here, a patient returns for a routine checkup to a physician who has treated her for years; it is restricted to such foolhardy actions as "where one tries to beat a rapidly approaching train across the track, to engage in drag racing or to walk upon a frozen pond where the ice is thin." *Myers v. Boleman,* supra at 510, and cases cited. See also *Osburn v. Pilgrim,* 246 Ga. 688 (273 SE2d 118) (1980).

Appellee's requested charge, that a patient who fails to disclose some aspect of her medical history which may involve risk or harm may be deemed to have voluntarily and unreasonably encountered a known risk, imputes to Mrs. Hawkins a duty to volunteer the information of her sulfa allergy on each visit to every doctor, with no duty on the part of the physician to make any inquiry. While *Mackey v. Greenview Hospital,* 587 SW2d 249, 255 (Ky. 1979), the case from which appellee derived the charge, does recite that for his own safety a patient must exercise ordinary care to give an accurate history to his doctor, tell the truth and not mislead him, it holds that "[t]he

physicians had the primary responsibility for obtaining a complete and accurate history from [the plaintiff patient] . . . [The patient] was under no general duty to diagnose her own condition or to volunteer information. She could reasonably expect that the physicians and nurses would ask the proper questions. Unless the physicians or nurses exercised ordinary care in obtaining the history, the patient's failure to communicate a particular aspect of his medical history ordinarily will not constitute contributory negligence." Accord, Favalora v. Aetna Cas. & Sur. Co., 144 S2d 544 (La. App. 1962); Sanzari v. Rosenfeld, 167 A2d 625 (N. J. 1961). See generally Annots., 45 ALR3d 928 (1972) and 52 ALR3d 1084 (1973). The charge as requested and given was an incorrect statement of an abstract principle of the law. Moreover, since Mrs. Hawkins testified that she had previously told Dr. Greenberg of her allergy to sulfa products, and Dr. Greenberg admitted that he did not ask Mrs. Hawkins if she knew of any allergies before he prescribed the AVC suppositories, this particular instruction was also plainly not adjusted to the evidence and should have been denied. See *Builders Homes v. Wallace Pump & Supply Co.,* 128 Ga. App. 779 (197 SE2d 839) (1973).

There appear to be no Georgia cases directly dealing with the duty of a physician to take a medical history before prescribing a potentially harmful drug. We consider it significant that this court, however, in the previous appearance of this very case, relieved the pharmaceutical company from liability under the theory " 'that where *prescription* drugs are concerned, the manufacturer's duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use . . . *As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative.* Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as a "learned intermediary" between manufacturer and customer.' " (Emphasis supplied.) *Hawkins v. Richardson-Merrell, Inc.,* supra at 483, quoting with approval Reyes v. Wyeth Laboratories, 498 F2d 1264, 1276 (5th Cir. 1974).

We consider it of at least cumulative importance to note that the jury was instructed that "[t]he law recognizes that medicine is an inexact science at best and all that a doctor may do is assist nature in accordance with the state of medical experience existing at the time

of treatment." This charge has recently been disapproved as "argumentative, inappropriate and misleading" in malpractice actions, and thus was also given erroneously. *Blount v. Moore,* 159 Ga. App. 80 (1) (1981). Although deemed to be harmless error in *Blount,* this charge in the present case, when combined with the other harmful and prejudicial charges objected to, requires the granting of a new trial for appellants.

3. The remaining enumerations are without merit or unlikely to recur upon retrial.

*Judgment reversed. Quillian, C. J., concurs. McMurray, P. J., concurs in the judgment only.*

DECIDED JUNE 30, 1981 —
REHEARING DENIED JULY 16, 1981 

*Henry Angel, Michael K. Jablonski,* for appellant.
*Robert G. Tanner,* for appellee.