### 65798. HAWKINS et al v. GREENBERG.

POPE, Judge.
Appellants Mr. and Mrs. Hawkins sued to recover damages for injuries allegedly sustained by Mrs. Hawkins on September 16, 1974 as a result of an allergic reaction to a drug containing sulfa. Appellant contended that the drug was negligently prescribed by appellee Dr.

Greenberg when he knew or should have known that Mrs. Hawkins was allergic to sulfa. The manufacturer of the drug and the pharmacy which filled the prescription were named as codefendants but removed prior to trial on motion for summary judgment. See *Hawkins v. Richardson-Merrell, Inc.,* 147 Ga. App. 481 (249 SE2d 286) (1978). The case proceeded to jury trial against Dr. Greenberg and a verdict was reached in his favor. An appeal to this court resulted in the grant of a new trial "because instructions given to the jury by the trial court, particularly as to assumption of the risk by Mrs. Hawkins, were so inappropriate and prejudicial as to effectively remove the determination of the controlling issue from the jury." *Hawkins v. Greenberg,* 159 Ga. App. 302, 307 (283 SE2d 301) (1981). The case was tried again on May 25, 1982; appellants' motion for directed verdict on liability was denied and on submission to the jury on all issues, a verdict was returned in favor of Dr. Greenberg. Upon denial of their motion for new trial, or in the alternative for judgment notwithstanding the verdict, appellants bring the instant appeal.

1. Appellants' first three enumerations of error are based upon the contention that Dr. Greenberg did not establish that he exercised the requisite degree of care and skill as practiced by the medical profession generally.

(a) *The motion for directed verdict on the issue of liability.* A motion for directed verdict can be granted only "[i]f there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict. . . ." OCGA § 9-11-50 (formerly Code Ann. § 81A-150). Under the statutory definition of medical malpractice, "[a] person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be a tort for which a recovery may be had." OCGA § 51-1-27 (formerly Code Ann. § 84-924). Thus, there are three essential elements imposing liability upon which recovery is bottomed: (1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained. "Negligence alone is insufficient to sustain recovery. It must be proven that the injury complained of proximately resulted from such want of care or skill. A bare possibility of such result is not sufficient." *Maddox v. Houston County Hospital Auth.,* 158 Ga. App. 283, 284 (279 SE2d 732) (1981).

The evidence presented here was in conflict as to whether Mrs. Hawkins was in fact allergic to sulfa, and if so, when this allergy was discovered. It was shown that from her arrival in Atlanta in 1969 until

September of 1974, Mrs. Hawkins was seen regularly by five doctors, including Dr. Greenberg, her gynecologist. With the exception of Dr. Greenberg, the medical records of all the doctors who treated Mrs. Hawkins contained notations indicating that she was allergic to sulfa, but it is not clear from their testimony or depositions when this information had been obtained.

Mr. Hawkins remembered that his wife first became aware of her sulfa allergy when he was in the Navy, between 1963 and 1976. Mrs. Hawkins testified that she learned of her allergy to sulfa in late 1970 or early 1971, recalling that at that time she was given some pills containing sulfa (Azotrex) by her general practitioner, Dr. Abernathy, which caused her to break out in a rash. She stated that she discussed this reaction with Dr. Abernathy and he told her not to take sulfa products any longer. Dr. Abernathy testified that he was not sure he had ever prescribed Azotrex for Mrs. Hawkins, that it was impossible for him to tell from his records whether he had learned Mrs. Hawkins had a sulfa allergy before or after September of 1974, and that he had no recollection of or any notation that she had complained of any reaction to any drugs he had prescribed.

Dr. Busey, a urologist, first saw Mrs. Hawkins in September of 1970, at which time she advised him she had no allergies. He did not see her again until March of 1974, when he inquired if she then had any allergies and was told by her that she did not. The first time Dr. Busey was advised by Mrs. Hawkins that she had any allergies was January 6, 1975, when she reported that she had experienced a reaction to penicillin. However, he testified that he had given her penicillin or penicillin derivatives on many occasions prior to 1975 and she had never evidenced any reaction.

Dr. Davidson, an allergist, tested Mrs. Hawkins for allergies in 1972 and determined that she was allergic to many substances, primarily foods. While his records indicated that Mrs. Hawkins told him she was allergic to sulfa, this was never established by any scientific study done by him. The records of Dr. Miller, Mrs. Hawkins' dentist, did not include any information on the form specifically requesting the patient to list medications to which she was allergic.

At the time of the incident in question Mrs. Hawkins was receiving a series of periodic injections designed to desensitize her proven allergies. The injected materials were prescribed by Dr. Davidson and administered by Dr. Abernathy in his office for the convenience of the patient. In August of 1974 Dr. Busey put Mrs. Hawkins on a medication known as Donnaseps for a bladder infection, which she was also taking at the time the injuries complained of occurred.

Dr. Greenberg testified that at no time did Mrs. Hawkins ever advise him of any allergy to sulfa. His office records show that in November of 1973, during the visit immediately preceding his prescribing the product in question, he inquired of Mrs. Hawkins about the development of any allergies, to which he noted "no drug allergies."

On September 9, 1974 Mrs. Hawkins visited Dr. Greenberg for a routine checkup. She exhibited symptoms of vaginitis and he gave her a prescription for AVC vaginal suppositories, a medication containing sulfa. He did not inquire on this visit whether she was allergic to any medication, having done so at the previous visit less than a year before. Mrs. Hawkins filled the prescription on September 15, inserted a suppository before retiring and slept through the night without incident. The following morning she was pale, "weak and jittery," but indicated that she often felt this way when she got her allergy shots. She received her regular desensitization injection at Dr. Abernathy's office and pursued her normal activities until 2:00 or 2:30 p.m., when she noticed red splotches and welts on her legs. About 4:00 p.m. she drove back to Dr. Abernathy's office where she suffered an acute anaphylactic allergic reaction resulting in total loss of blood pressure, seizures and laryngospasms with a heart rate of 140 beats per minute. Dr. Abernathy administered emergency treatment, finding a swelling on her upper arm in the area where the desensitization injection had been given, and told her to discontinue taking the Donnaseps. Mrs. Hawkins was then taken to the hospital where she received extended treatment for physical and mental complications.

While Dr. Abernathy concluded that the allergic reaction was "most likely" due to the AVC suppository, he could not say with certainty. He also stated that 24 hours after the application of such a product was a "long time to suspect a severe systemic reaction occurring." One of the symptoms exhibited by Mrs. Hawkins during the attack and later in the hospital was hyperventilation, where she either voluntarily or involuntarily overbreathed until she became faint or short of breath. Mrs. Hawkins had also experienced such symptoms as early as December of 1971, and again in 1972, according to Dr. Abernathy's records.

Based on this evidence, a jury question was presented as to whether Mrs. Hawkins' injuries were caused by an allergy to sulfa. See *McCormick v. Avret,* 154 Ga. App. 178 (1) (267 SE2d 759) (1980). Moreover, while appellants presented sufficient evidence from which the jury might have determined that Dr. Greenberg knew or should have ascertained that Mrs. Hawkins was allergic to sulfa, and was thus negligent in prescribing this medication, such a verdict was not

demanded as a matter of law. Hence, the trial court did not err in refusing to direct a verdict in favor of appellants. *Summerour v. St. Joseph's Infirmary,* 160 Ga. App. 187 (286 SE2d 508) (1981).

(b) *The motion for new trial or in the alternative for judgment notwithstanding the verdict.* Contrary to appellants' arguments, the two previous *Hawkins* cases did not establish as matter of law that a physician has a legal duty upon each occasion of prescribing a potentially dangerous drug to inquire of any known allergies of the patient. Nor are appellants correct in their contention that Dr. Greenberg failed to offer competent evidence that the procedures he followed were in keeping with the standard of care and skill generally observed in the medical profession. His own testimony was sufficient to warrant the jury to conclude, as they did, that his treatment of Mrs. Hawkins was not such a significant deviation from the established parameters of acceptable professional conduct as would constitute malpractice. See *Parker v. Knight,* 245 Ga. 782 (3) (267 SE2d 222) (1980); *Hughes v. Malone,* 146 Ga. App. 341 (247 SE2d 107) (1978). It follows that these issues were also properly ones for jury decision, and that the trial court did not err in refusing to grant appellants' motion for judgment notwithstanding the verdict or for new trial.

2. During deliberations the jury sent the trial court a written question as to whether they had been instructed "that it was the doctor's responsibility to advise or request the patient to the contents of the drug [sic] rather than the druggist or the manufacturer of the drug or the patient." The trial court reread several of the instructions given, which were based primarily on the holding in *Hawkins v. Richardson-Merrell,* supra, concluding with the statement: "Now, the doctor is not under a duty to inform the patient of the contents of the drug. He's under a duty to ascertain and determine whether or not that is or is not an appropriate drug for that particular patient and that is the reason for his duty to ascertain the history of the patient. But when he should obtain such history is a factual question depending upon the standard of care as defined by professionals in general." When queried by the court as to whether that answered their question, the jury foreman requested the court to "repeat that last part again." The court responded, "It is the legal duty of a physician to take a medical history before prescribing a potentially harmful drug. And in regard to when in time that that history should be taken is a fact question based upon the standard of care as testified by the doctors and you must determine what that standard of care is for physicians in general, not what an individual — what one individual practitioner would do versus another. And in other words, when that history should be taken is a matter to be determined from the general standard of care that has been outlined, if it has been

outlined by the testimony."

Appellants objected to the above quoted instructions, contending that the court should have explained to the jury "that the standard of care exercised by the medical profession generally is to ask if one is allergic to the drug at the time the drug is being prescribed." They assert on appeal that it was reversible error to charge the jury that a doctor has no duty to inform the patient of the contents of a drug being prescribed, because, at the very least, this was a jury issue. We do not agree. The first *Hawkins* decision places upon a physician the duty to determine the proper medication for each patient, weighing its benefits against its potential dangers. The instructions given here correctly presented the issue to the jury.

3. Another charge of the court objected to by appellants, that the law presumes that the medical or surgical services were performed in an ordinarily skillful manner, "is a complete and correct statement of the law." *Evans v. DeKalb County Hosp. Auth.,* 154 Ga. App. 17, 20 (267 SE2d 319) (1980). We find no grounds for reversal for any reason assigned.

*Judgment affirmed. Quillian, P. J., and Sognier, J., concur.*

DECIDED APRIL 21, 1983 —
REHEARING DENIED MAY 11, 1983 —

*Henry Angel,* for appellants.
*Robert G. Tanner,* for appellee.