Alberta A. GARBACCIO, M.D., et al.

v.

W.H. OGLESBY, M.D., et al.

Civ. A. No. 86–13–VAL (WDO).

United States District Court,
M.D. Georgia,
Valdosta Division.

Dec. 11, 1987.

William D. Chaklos, Detroit, Mich., W.G. Elliott, Valdosta, Ga., for plaintiffs.

Wade H. Coleman, Valdosta, Ga., Bob Reinhardt, Tifton, Ga., for defendants.

OWENS, Chief Judge:

Plaintiffs Alberta A. Garbaccio, M.D., and Saint Mary's Hospital brought this ac-

---

tion seeking contribution from defendants W.H. Oglesby, M.D., and Tift County General Hospital for damages paid by plaintiff St. Mary's to patient Beth Hansen and her husband Howard pursuant to a verdict rendered in Michigan state court. The parties requested a non-jury trial, and this court heard the case on October 1, 1987, in the United States District Court for the Middle District of Georgia, Valdosta Division. Having considered the evidence [1] presented at trial and the arguments of the parties, this court now enters this memorandum opinion pursuant to Rule 52 of the Federal Rules of Civil Procedure.

*Background:* [2]

On the morning of February 27, 1982, Beth Hansen, a kidney patient treating with the kidney center at St. Mary's Hospital in Grand Rapids, Michigan, sought aid at the emergency room of Tift General Hospital in Tifton, Georgia. Beth and her husband Howard were en route to Florida at the time. St. Mary's had made arrangements for Beth's condition to be monitored by a nephrology clinic in Bradenton, Florida, while she was on vacation. However, Beth decided emergency treatment might be necessary because of the "cloudy" appearance of the effluent in her dialysis bag.

Beth employed a type of dialysis known as contiguous ambulatory peritoneal dialysis ("CAPD"). This method of dialysis utilizes a surgically implanted catheter and a plastic bag filled with a glucose solution to continually cleanse the body of impurities which accumulate therein because of the patient's kidney failure. A frequent problem associated with this method of dialysis is the development of peritoneal infection, that is, the inflammation of the peritoneal membranes due to bacterial, viral or fungal agents.

Inez Holt, L.P.N., and Nancy Hall, R.N., took Beth Hansen's medical history upon her arrival at Tift General's emergency room. The nurses provided a container to Beth to enable her to provide for examination a sample of the fluid contained in her bag.

Dr. Oglesby, who had no experience in treating patients utilizing CAPD, was the emergency room physician on duty. Though he conducted no physical examination of the patient, he examined the specimen and determined that Beth Hansen was suffering from an infection. He prescribed keflex,[3] an antibiotic that Dr. Oglesby believed would suffice as an interim treatment until Beth reached Florida.

While at a local pharmacy having the prescription filled, Beth and Howard decided to inform St. Mary's of the day's occurrences. The Hansens reached nurse Diane Mehall who advised them that the treatment prescribed by Dr. Oglesby was insufficient for her condition. Nurse Mehall indicated that Beth needed some medication inserted directly into the effluent bag. She instructed the Hansens to return to Tift General Hospital and to advise Dr. Oglesby to phone Dr. Garbaccio, the doctor on duty at St. Mary's Hospital.

Beth and Howard returned to Tift General and informed the staff of nurse Mehall's instructions. Nurse Hall placed the call to Michigan as requested, and she gave Dr. Oglesby the telephone. Dr. Oglesby spoke with Dr. Garbaccio for five to ten minutes, writing on the medical chart as the conversation progressed.

Neither physician has complete recollection of the telephone conversation; no other party monitored the conversation. Dr. Oglesby recalled informing Dr. Garbaccio of his inexperience in the field of nephrology and of his uncertainty in treating pa-

---

1. Depositions taken for use in the Michigan litigation have been admitted into evidence in this action.

2. This section is entitled "Background" for purposes of clarity and organization. However, the facts contained herein are specifically found to be true as reported.

3. Keflex, kefzol and keflin are names used both in the depositions and by the witnesses for essentially the same drug. One name may refer to the drug itself while another may refer to a brand name. Garamycin and gentamycin are likewise alternate names for a second drug, the use of which is at issue in this case. The court attaches no relevance to the particular names employed.

tients using CAPD. Dr. Oglesby specifically recalled the drugs in question and the method of their administration, but he did not have an independent recollection of the dosages. Dr. Garbaccio, who answered the telephone in the midst of her rounds and who neither requested nor examined Beth Hansen's medical records, also recalled the drugs prescribed, but her specific recollection beyond that fact is limited.

According to notes Dr. Oglesby transcribed on the medical records at the time of his conversation with Dr. Garbaccio, she prescribed the following: "Kefzol 0.5gm [2] cc Qid[4] into 2 liter dialysis bag" and "Gentamycin 80 mg. [2] cc Qid into 2 liter dialysis bag." Dr. Oglesby also wrote that Beth Hansen should continue administering the prescribed drugs at the dosage level of "Kefzol 500 mg." and "garamycin 80 mg." four times daily. *See* Defendants' Exhibit 1.

The dosage of gentamycin that Beth Hansen was to continue four times daily was too high. Normally, a "loading dose" of a particular drug is administered to the patient to provide an immediate supply of the drug to the patient's system. That dosage, however, is reduced thereafter to a "maintenance" level, that is, a smaller dosage designed to maintain a certain amount of the drug in the body. In this instance, the reduction from loading dose to maintenance dose did not occur at the appropriate time.[5] Beth Hansen continued to administer, pursuant to the instructions given her by Dr. Oglesby as a result of his conversation with Dr. Garbaccio, a dangerously high level of gentamycin.

Among the side effects of gentamycin in renally impaired patients is ototoxicity and eighth nerve involvement. In laymen's terms, excessive dosages of gentamycin in renally impaired patients can result in loss of hearing, vertigo and balance difficulties. Such symptoms were exhibited by Beth

Hansen within one month of her visit to Tift General Hospital. Ultimately, Beth Hansen suffered permanent hearing loss, a condition attributed to an overdose of gentamycin.

Subsequently, the Hansens filed suit in Michigan. The defendants included Doctors Garbaccio and Oglesby and St. Mary's and Tift General Hospitals. The court dismissed the claims against Dr. Oglesby and Tift General Hospital for lack of personal jurisdiction. The Michigan jury found Dr. Garbaccio and St. Mary's negligent and returned a joint and several verdict of $150,000 for Beth and $53,000 for Howard. With interest, the judgment amounted to $256,500, and it was paid by St. Mary's.

Plaintiffs filed this action on February 4, 1986, alleging that Dr. Oglesby was negligent in prescribing an excessive dosage of antibiotics to Beth Hansen. Plaintiffs argue that Dr. Oglesby was negligent either in failing to ensure that he understood Dr. Garbaccio's instructions or in failing to confirm the appropriateness of the dosage before prescribing the medication. Such negligence, plaintiffs allege, was the proximate cause of Beth Hansen's injuries. Plaintiffs further allege that Dr. Oglesby's negligence, in his capacity as an agent for Tift General Hospital, imposes liability upon the hospital under a theory of vicarious liability. Based upon the above allegations, plaintiffs contend that they are entitled to contribution from defendants as joint tortfeasors for the amount plaintiffs paid in excess of their pro rata share of liability.

*Findings of Fact:*[6]

1. Dr. Oglesby is an experienced emergency room physician whose corporation, William H. Oglesby, M.D., P.C., was under contract with Tift General Hospital for the purpose of rendering emergency medical care on the premises of the hospital seven days per week. *See* Defendants' Exhibit 5.

---

**4.** Four times a day.

**5.** The dosage was reduced when Beth visited Dr. Stephen Berkes at the nephrology clinic in Florida the next week. No other action was taken by Dr. Berkes at that time.

**6.** The court distinguishes these findings from the "Background," *supra,* only by their particular relevance to plaintiffs' cause of action, that is, the action for contribution based upon plaintiffs' allegations that Dr. Oglesby behaved negligently.

2. Dr. Oglesby was the physician on duty the morning of February 27, 1982. The emergency room was not busy. Dr. Oglesby treated Beth Hansen for an infection on that morning, prescribing the antibiotic keflex. Deposition of Dr. William H. Oglesby, pp. 21–27, 32–22.

3. St. Mary's Hospital and Dr. Garbaccio countermanded Dr. Oglesby's prescription and assumed control of Beth Hansen's treatment. Deposition of Diane Mehall, pp. 45–46; Deposition of Beth Hansen, pp. 52–53; Deposition of Dr. Alberta A. Garbaccio, pp. 51–54; Cross–Examination of Dr. Garbaccio, pp. 13–14.

4. Dr. Garbaccio was a board-certified specialist in internal medicine and nephrology. *See* Direct Examination of Dr. Garbaccio.

5. Dr. Oglesby informed Dr. Garbaccio by telephone of his inexperience in treating CAPD patients. Dr. Oglesby reasonably relied upon Dr. Garbaccio, a board-certified specialist in nephrology and a physician affiliated with the clinic of which Beth Hansen was a patient, in prescribing medication for a patient employing CAPD. Deposition of Dr. William H. Oglesby, pp. 41–46. *See* Direct and Cross Examination of Dr. Gail V. Anderson and Dr. James William Mathis.

6. Dr. Oglesby wrote on the medical chart as he spoke with Dr. Garbaccio. While Dr. Oglesby may have interpreted Dr. Garbaccio's instructions regarding the medication to be dispensed to Beth Hansen, he accurately transcribed on the medical chart the prescription as ordered by Dr. Garbaccio.[7] The prescription as ordered by Dr. Garbaccio and as recorded by Dr. Oglesby was the one received and taken by Beth Hansen. Deposition of Dr. William H. Oglesby, pp. 43–49; *See* Direct Examination of Dr. Oglesby.

7. Dr. Oglesby had used gentamycin occasionally before. He knew of its dangerous propensities, and he was slightly surprised at the dosages Dr. Garbaccio prescribed in the treatment of Beth Hansen.

He had no knowledge of the absorption rate of the drug when used in a dialysis bag. *See* Direct and Cross Examinations of Dr. William H. Oglesby.

8. Dr. Oglesby did not consult the *Physician's Desk Reference ("PDR")* or another nephrologist regarding the propriety of the treatment ordered by Dr. Garbaccio. *Id.* If Dr. Oglesby had consulted the *Physician's Desk Reference,* he would not have found information regarding the appropriateness of Dr. Garbaccio's prescription in situations such as the one faced by Dr. Oglesby. The *PDR* did not address the administration of gentamycin in CAPD patients. *See* Cross Examination of Dr. Oglesby.

9. Beth Hansen suffered permanent hearing loss as a result of an overdose of gentamycin. Such injury is an indivisible one. The injury was complete before Beth Hansen sought treatment at the nephrology clinic in Bradenton, Florida. *See* Testimony of Dr. Walter Meester, M.D., Michigan Trial Transcript, pp. 205–07.

*Conclusions of Law:*

1. This court properly has jurisdiction in this case based upon the parties' diversity of citizenship. Substantive issues must be decided on the basis of Georgia law. *See* 19 Wright, Miller & Cooper, Federal Practice and Procedure: § 4509 (1982).

2. "A claim for indemnity or contribution may be entertained unless, as a matter of Georgia law, there is no actionable negligence" on the part of Dr. Oglesby. *Crockett v. Uniroyal, Inc.,* 772 F.2d 1524, 1530 (11th Cir.1985). The nature of the action ultimately brought depends upon the character of the negligence alleged. If it may be demonstrated that one party was actively negligent in the face of the other party's passive negligence, an action for indemnity lies. If both parties are arguably negligent but no apportionment of relative negligence may be made, the claim is one for contribution. *Id.* at 1531.

---

**7.** Dr. Oglesby may or may not have written the instructions "word for word." This court finds, however, that he accurately wrote the drugs, dosage levels and frequencies as told to him by Dr. Garbaccio.

3. O.C.G.A. § 51–12–32(a) provides that contribution among several trespassers may be enforced just as if an action had been brought against them jointly. "The term 'joint trespassers' is synonymous with 'joint tortfeasors'" and "the right of contribution from a joint tortfeasor not sued in the action is a substantive right." *Hyde v. Klar*, 168 Ga.App. 64, 65, 308 S.E.2d 190, 192 (1983).

4. Under Georgia law, individuals are joint tortfeasors "when separate and distinct acts of negligence on their parts concur as the proximate cause of an injury." *Crockett*, 772 F.2d at 1529.

5. "The contribution defendant must be a tortfeasor, and originally liable to the plaintiff. If there was never any such liability ..., then he is not liable for contribution." W. Prosser, Law of Torts 309 (4th ed. 1971).

6. In a medical malpractice action in Georgia, a plaintiff-patient must establish three essential elements to impose liability: "(1) the duty inherent in the [medical-professional]-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care;" and (3) the causal connection between the breach and the injury sustained. *Cherokee County Hospital Authority v. Beaver*, 179 Ga.App. 200, 201, 345 S.E.2d 904, 905 (1986), *citing Hawkins v. Greenberg*, 166 Ga.App. 574, 575, 304 S.E.2d 922 (1983). The law presumes that a physician performs his skills in the medical and surgical fields in a skillful manner. *See Skinner v. Coleman–Nincic Urology Clinic*, 165 Ga. App. 280, 300 S.E.2d 319 (1983). Thus, to establish the second element identified above, that is, a lack of due care, skill and diligence, a plaintiff generally must produce expert testimony to show that the defendant deviated from the required standard of care. *Cherokee County Hospital Authority*, 179 Ga.App. at 201, 345 S.E.2d at 905.

7. Until recently, the applicable standard of care in a medical negligence action brought under O.C.G.A. § 51–1–27 was that care which, under similar conditions and like circumstances, would be ordinarily employed by the medical profession generally. *Skinner*, 165 Ga.App. at 281, 300 S.E.2d at 321. A recent case, however, appears to alter that application of a "national standard." *See Duggar v. Danello*, 175 Ga.App. 618, 334 S.E.2d 3 (1985). The Georgia Court of Appeals, relying upon an opinion recently announced by the Georgia Supreme Court,[8] held that neither national standards nor the standards applicable to a majority of competent emergency room physicians was the appropriate standard in Georgia. Rather, the court held that a physician has a duty to exercise that "degree of care and skill required of the physician in malpractice cases in Georgia." *Id.* at 621, 334 S.E.2d at 6.

8. In Georgia, "a physician can be held negligent for referring a patient he knows to be in need of a particular type of care to a physician who cannot provide it." *Rise v. United States*, 630 F.2d 1068, 1072 (5th Cir.1980).[9] By analogy, this court determines that a doctor with knowledge that a patient needs treatment he is unable to provide has a duty to consult with a doctor more experienced in that particular field. Expert testimony at trial and in deposition supports this conclusion. *Cf. United States v. Buck*, 433 F.Supp. 896 (M.D.Fla. 1977) (physician in charge of emergency room with no experience in treating snakebites who fails to consult with one so trained may be found liable for negligence). Georgia law also indicates that a physician who referred a patient to a second physician may have a continuing duty to supervise the care of that patient where the referral was to a specialist for limited consultation and the patient's primary care remained the responsibility of the referring physician. *Rise*, 630 F.2d at 1072.

---

8. *Kellos v. Sawilowsky*, 254 Ga. 4, 325 S.E.2d 757 (1985) (case examining liability in legal malpractice action).

9. All decisions of former Fifth Circuit decided prior to October 1, 1981, have been adopted as precedent in the Eleventh Circuit. *Bonner v. Prichard*, 661 F.2d 1206 (11th Cir.1981).

9. In Georgia, physicians ordinarily are responsible for the prescriptions dispensed pursuant to their signatures. The law makes it incumbent upon a physician "to determine the proper medication for each patient, weighing its benefits against its potential dangers." *Hawkins,* 166 Ga.App. at 579, 304 S.E.2d at 925. Experts for both plaintiffs and defendants testified as to the duty of a physician to prescribe proper medication. Both experts also testified that, and this court concludes likewise as a matter of law, a physician satisfies that duty by consulting in a non-negligent fashion either appropriate reference materials or qualified specialists.

10. This court has been unable to locate case law which establishes either a "duty to understand" or a "duty to communicate." However, expert testimony both at trial and in deposition clearly provides the foundation for such a duty. *See* Deposition of Mack V. Greer. Consultation between physicians by telephone, experts or otherwise, is a common occurrence. Critical decisions are often made over the telephone, and this court finds it reasonable to impose upon the parties to such a conversation a duty both to conduct that conversation with care and to record its substance (when necessary) in a non-negligent fashion. One manner of satisfying that duty is to write on a medical chart while participating in a conversation. Other methods, such as the utilization of recording devices, might also be employed.

11. Georgia now recognizes the doctrine of apparent or ostensible agency as a viable theory of liability in hospital emergency room situations. *See Richmond County Hospital Authority v. Brown,* 257 Ga. 507, 361 S.E.2d 164 (1987). To establish a hospital's liability for the acts of physicians performing services there as independent contractors, a plaintiff-patient must establish the following: (1) the hospital represented that the physicians were its agents; and (2) the plaintiff-patient must justifiably rely on the care and skill of the apparent agent whose negligence causes the injury. *Id.*

12. To establish a right to contribution, plaintiffs must show by a preponderance of the evidence that Dr. Oglesby was negligent in his care or treatment of Beth Hansen. O.C.G.A. § 24-4-3 (1982).

*Discussion:*

■ Plaintiffs in this action are in the position of having to establish that Dr. Oglesby was negligent in his care and treatment of Beth Hansen. Plaintiffs' first theory alleges that Dr. Oglesby was negligent in failing to make certain that he understood Dr. Garbaccio's instructions regarding the drugs prescribed for Beth Hansen. Dr. Oglesby shared with Dr. Garbaccio the duty to conduct the telephone consultation non-negligently. Further, Dr. Oglesby had the duty to use reasonable care in transcribing upon the medical chart Dr. Garbaccio's oral instructions.

■ To succeed on this theory, then, plaintiffs must show by a preponderance of the evidence a breach of either of those duties. Plaintiffs are unable to do so. Plaintiffs rely upon Dr. Garbaccio's assertions that Dr. Oglesby must have made a mistake because Dr. Garbaccio as a board-certified specialist in nephrology has extensive experience in this area and would not prescribe such medication in such dosages. This testimony as to Dr. Garbaccio's routine does not overcome the evidence that Dr. Oglesby transcribed directly upon the medical chart Dr. Garbaccio's instructions as she relayed them. Dr. Garbaccio was called in the midst of her rounds, and she never examined Beth Hansen's medical records. While these two factors do not establish negligence per se, they do indicate Dr. Garbaccio's preoccupation with other matters. Contrasting that preoccupation with the unhurried situation in the emergency room in Tift General Hospital, this court finds Dr. Garbaccio's preoccupation the more likely source of the error in communication.

Dr. Oglesby conducted himself as any emergency room doctor in the same or similar circumstances would have done. He listened attentively to Dr. Garbaccio's instructions, and he wrote those instructions on the medical chart as he received them.

 Plaintiffs' second theory alleges that Dr. Oglesby was negligent in failing to confirm the appropriateness of the dosages and frequencies before prescribing the medication. In essence, plaintiffs argue that physicians are responsible for the prescriptions dispensed pursuant to their signatures. Ordinarily, this statement is an accurate reflection of the law. However, testimony at trial and in deposition established that the consultation process which occurred in this case is very common. When an emergency room doctor faces an unfamiliar situation, as Dr. Oglesby did in treating a CAPD patient like Beth Hansen, the standard medical practice requires that he consult a physician experienced in such treatment. Dr. Oglesby did so. He consulted with a board-certified nephrologist, Dr. Garbaccio, a specialist who also happened to practice at the very kidney center where Beth Hansen was undergoing treatment. That he did so at the behest of the patient and without actual knowledge of Dr. Garbaccio's qualifications is without import. The conduct leading to Beth Hansen's injuries was the direct result of the consultation.

At the moment Dr. Oglesby called Dr. Garbaccio, Dr. Garbaccio assumed control of Beth Hansen's treatment. This situation, unlike that in *Rise, supra,* was not one where Dr. Oglesby sought only limited advice. He retained no supervisory authority. While this court does not condone the abrogation of a physician's medical judgment when a consultant is called in, the reality of this situation requires this court to recognize that Dr. Garbaccio, as the more qualified physician, dictated the treatment and that Dr. Oglesby properly deferred to her judgment. Dr. Oglesby had no knowledge of the absorption rate of gentamycin in a CAPD situation. To insist that Dr. Oglesby then examine the Physician's Desk Reference or call another specialist would create an endless situation of "double-checking" that might prevent prompt action. Further, Dr. Oglesby's lack of knowledge in the field of nephrology could well have prevented him from making an informed judgment as to the propriety of the treatment. Therefore, plaintiffs'

allegation that Dr. Oglesby was negligent in failing to ensure the appropriateness of the prescription beyond the effort of consulting a nephrologist must fall.

In accordance with the above discussion, this court finds that plaintiffs are not entitled to contribution from Dr. Oglesby. Necessarily then, plaintiffs are not entitled to contribution from Tift General Hospital under the theory of apparent agency.