A09A0681. CLAY et al. v. RIPPY et al.
(682 SE2d 330)

ANDREWS, Presiding Judge.

Tina Clay appeals from the trial court's grant of summary judgment to the defendant health care providers on her child's claim of a "preconception tort." The complaint alleged that defendants committed medical malpractice by failing to advise Clay to take folic acid supplements before she became pregnant. Because we agree that there is no evidence that the doctors' treatment of Clay fell below the requisite standard of care, we affirm.

The plaintiff in this case, six-year-old Tia Guinn, alleges that the defendant health care providers committed medical malpractice by failing to advise her mother to take folic acid supplements before she was conceived. Guinn claimed that the supplements were necessary to reduce the risk of neurological defects, especially in light of the fact that her mother had already conceived a child with such defects. She alleges that this failure to advise her mother caused her to be born with profound neurological problems.

Viewed in the light most favorable to Guinn and Clay, the record shows that Clay went to her county health department in March 1999 to see if she was pregnant. She was 19 years old, had never been

---

to a gynecologist and had no primary care physician. Clay was referred to obstetrician-gynecologist Lee Rippy because she was 11 weeks pregnant. Although she could not recall Rippy's prescribing or giving her prenatal vitamins, Rippy's records show that he placed her on prenatal vitamins when she first saw him.

In April 1999, Rippy saw a "shadow" on Clay's ultrasound and referred her to Dr. Richard Molina at Atlanta Maternal-Fetal Medicine, a specialist who managed high-risk pregnancies, for a high-resolution ultrasound and consultation. On May 4, 1999, Molina confirmed that, at 21 weeks, Clay's baby had a severe neural tube defect. Molina counseled Clay regarding the baby's prognosis and her options, which included a therapeutic termination of the pregnancy. Clay testified she was "kind of in shock" and did not discuss with Molina what the diagnosis would mean for a future pregnancy. Molina scheduled Clay for a follow-up ultrasound on May 24, 1999, and faxed his results to Dr. Rippy.

Clay saw Rippy two days later and he recommended that she terminate the pregnancy. Rippy told Clay that the baby would have severe birth defects and would not likely survive. Clay testified she had no discussion with Rippy regarding folic acid, prenatal vitamins, causation, or what the diagnosis would mean for a future pregnancy. Clay decided to terminate the pregnancy and went to Dr. Malloy, who performed the procedure at the Atlanta SurgiCenter. Although instructed to do so by Rippy, Clay did not schedule a follow-up appointment with him following the termination.

In 2002, Clay was seen in the emergency room in Panama City and found out that she was pregnant again. She returned to Rippy for prenatal care in April 2002. Clay stated that she did not recall Rippy's prescribing prenatal vitamins until she asked for them in the third or fourth month of her pregnancy and said she had no discussions with him about her baby's increased risk of spina bifida or the importance of folic acid. She took prenatal vitamins throughout the rest of her pregnancy.

Clay underwent numerous tests recommended by Rippy during her 2002 pregnancy. The tests confirmed that this child was also developing with serious neurological defects. Clay chose not to terminate this pregnancy, and Tia Guinn was born in November 2002 with severe birth defects.

On behalf of her daughter, Clay sued Rippy and his practice, Newton County Women's Health Center, P.C. d/b/a Newton Women's Health Center; Molina, the maternal-fetal medicine specialist who examined her in 1999, and his practice, Atlanta Maternal-Fetal Medicine, P.C.; Malloy, the physician who terminated her pregnancy in 1999; and the clinic where the termination was performed,

Atlanta SurgiCenter, Inc.[1] Clay alleged that the doctors committed malpractice by failing to prescribe and recommend that she take four mg. of folic acid daily before conceiving again to reduce the risk of having another baby with neurological defects.

In his affidavit, Clay's expert opined that all of the defendants were obligated, following the termination of her 1999 pregnancy, to recommend and prescribe for Clay a daily four mg. regimen of folic acid in order to prevent a recurrence of a neural tube defect in a subsequent pregnancy. According to the medical records, none of the doctors made such a recommendation or issued a prescription, or even spoke to her about the connection between folic acid and the prevention of this birth defect. The expert concluded that Tia Guinn had "severe spina bifida as a direct result of the failure of her health care providers to administer appropriate folic acid to her in the peri-conceptual time period."

In granting summary judgment, the trial court noted that the statute of limitation does not bar the child's claim because OCGA § 9-3-73 (b) allows a minor to bring a medical malpractice action within two years from the date of her fifth birthday if the cause of action arose before she became five, as happened here. The court then found that the link between the doctors' conduct and the child's injuries was "too remote for the law to countenance a recovery" because the doctors only treated the mother in conjunction with her 1999 pregnancy and she never returned to any of them for post-termination or preconception care, treatment, or consultation. Under the facts and circumstances of this case, the trial court held, the connection between the doctors' actions and the child's injuries was "too remote to hold that Defendants owed a duty of care to unanticipated unconceived children simply because Clay was of childbearing years." This appeal followed.

First, we agree with Clay that, given the proper circumstances, a cause of action could exist in Georgia for preconception torts. *McAuley v. Wills*, 251 Ga. 3, 6 (303 SE2d 258) (1983) holds: "To the extent that the trial court ruled that a person owes no duty of care toward an unconceived child, we must disagree. Cases cited in Division 4, supra, show that, at least in some situations, a person should be under a duty of care toward an unconceived child." Id. at 6. Division 4 cites medical malpractice cases and one suit against a pharmaceutical company. Id. at 5-6.

Next, we look to the specific claims against each of the doctors.

---

[1] Clay also sued on her own behalf, but conceded during the summary judgment hearing that the statute of repose, OCGA § 9-3-71 (b), barred her claim. She did not raise the issue on appeal.

"[T]here are three essential elements [in a medical malpractice claim]: (1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained." *Hawkins v. Greenberg*, 166 Ga. App. 574, 575 (304 SE2d 922) (1983).

Here, the medical malpractice affidavit sets out the standard of care as follows:

> Following the termination of Ms. Clay's 1999 pregnancy, Dr. Rippy, Dr. Molina and Dr. Malloy each were obligated by the standard of care to recommend and prescribe for Ms. Clay a daily 4 mg. regimen of folic acid in order to prevent a recurrence of a neural tube defect in the event of a subsequent pregnancy. None of them made such a recommendation or issued such a prescription; nor did any of them, according to the medical records, even speak to Ms. Clay about folic acid and the prevention of a neural tube defect.

1. With regard to the claims against Dr. Rippy, the affidavit states: "The negligence and departures from the standard of care of Dr. Rippy . . . include a failure to recommend and prescribe appropriate folic acid to Ms. Clay following the termination of her 1999 pregnancy."[2] Rippy did not dispute that the standard of care required that he "supply the information [regarding the link between folic acid and NTD] in an understandable way and be complete."

Rippy claimed that he told Clay about the relationship between folic acid and neural tube defects when he saw her on May 6, 1999, before the first pregnancy was terminated, and never had the opportunity to reinforce that counseling regarding future pregnancies because she did not call him to make an appointment for a follow-up visit. When asked whether he would send a letter or make a phone call to Clay regarding the recommendation she take folic acid if he had not told her about it, he responded, "No. I would not have. . . . [S]he knew very well when she left the office that day it was

---

[2] We also note that the affidavit incorrectly assumes an ongoing patient relationship between Clay and the defendant doctors. As the trial court points out in its order, the OCGA § 9-11-9.1 affidavit is incorrect in that it states that the affiant doctor reviewed medical records pertaining to Clay's 1999 pregnancy and the care she received between 1999 and the time of her 2002 pregnancy and also states that the defendant doctors in their care and treatment of Clay from 1999 through 2002 failed to exercise the requisite degree of care and skill in not prescribing folic acid. As the doctors point out, there were no records to review because, against the instructions of both Malloy and Rippy, Clay never went back to any of the doctors. Because the doctors did not provide any care or treatment for Clay after her 1999 pregnancy, it is unclear what records the doctor supplying the malpractice affidavit could have reviewed.

her obligation she needed to come back in for a visit, and that is more than sufficient." By the time Clay returned to see Rippy, she was pregnant again and it was too late for a folic acid supplement to reduce the risks of birth defects.

Clay disputed Rippy's testimony that he advised her about folic acid at her May 6 visit before she terminated the 1999 pregnancy. She testified that at no time between the termination of her 1999 pregnancy and her 2002 pregnancy did he call or send a letter telling her she should come see him for an annual visit or recommending she take folic acid.

Assuming that Rippy did not discuss the need for folic acid at the May 6 visit, Rippy's undisputed testimony at his deposition was that he intended to discuss these issues and make medical recommendations to Clay at a follow-up visit. Rippy testified that he told Clay at the May 6 visit that "it was important" that she schedule a follow-up visit and that he was "quite specific" on the subject. Rippy said that he could not schedule a follow-up visit on May 6 while Clay was in the office because Clay was going to another physician and Rippy did not know what the outcome of that visit would be — or even if Clay would go through with the termination of the pregnancy. Rippy testified that the May 6 visit was not the time to counsel Clay on future pregnancies. She was crying and upset and faced with a difficult decision to terminate her pregnancy.

In light of this, we conclude that there is no evidence that Rippy violated his duty of care. Rippy did not know that this was the last time he would see Clay. Clay terminated the physician-patient relationship after this visit. Even if the duty of care survived this termination, it became impossible to satisfy because Clay did not make an appointment for follow-up care, as instructed.

Moreover, nowhere does the medical malpractice affidavit state that any of the doctors was required to discuss this issue before the termination of Clay's 1999 pregnancy or that the duty of care requires the doctor to monitor patient records, to identify patients who have not followed instructions to schedule an appointment, to determine whether the patient is treating with another doctor, or, if not, to determine whether there is information that was not provided to the patient, and then to determine the best way to communicate this information to the patient. This is not the standard of care set out in the malpractice affidavit and we find no evidence in the record raising any issue of fact that this could be the standard of care.

A defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case; instead, the burden on the moving party may be discharged by pointing out by reference to the affidavits,

depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case. If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue. OCGA § 9-11-56 (e).

*Lau's Corp. v. Haskins*, 261 Ga. 491, 491 (405 SE2d 474) (1991). In this case, Rippy has shown that his treatment of Clay did not fall below the standard of care set out in the affidavit and Clay has failed to come forward with any evidence in response that would create a triable issue of fact. Therefore, the trial court's grant of summary judgment to Rippy should be affirmed.

2. With regard to the claims against Dr. Molina, the record shows that Molina saw Clay one time for a consultation. Rippy sent Clay to Molina for the specific purpose of conducting and interpreting a high-resolution ultrasound, counseling Clay regarding his findings, and faxing his conclusions to Rippy. Molina thus had no ongoing doctor-patient relationship with Clay, but rather a circumscribed relationship related solely to managing her 1999 pregnancy. Clay's expert's affidavit is incorrect, therefore, when it states that Molina, or any of the doctors, failed in their care and treatment of Clay from 1992 through 2002.[3] It follows that the trial court did not err in granting summary judgment to Molina and to his practice, Atlanta Maternal-Fetal Medicine.

3. Likewise, the trial court did not err in granting summary judgment to Dr. Malloy. It is undisputed that Malloy's only contact with Clay was to terminate her pregnancy in 1999. Malloy did not treat Clay on an ongoing basis and only saw her once. Clearly the physician had a duty to perform the procedure and anything related to it without committing malpractice, but that does not constitute a duty to counsel the patient regarding future pregnancies. Given the nature of the limited doctor-patient relationship and lack of forseeability that injury to a child not yet conceived might arise from the relationship, Dr. Malloy had no duty to advise Clay about how to lower the risk of birth defects in potential future pregnancies.

4. Clay also sued Atlanta SurgiCenter, the facility at which Dr. Malloy performed the procedure terminating the 1999 pregnancy. But Clay did not seek counseling about future pregnancies at the facility, and the facility's employees had no duty to counsel Clay regarding the link between birth defects and folic acid. Clay argues that because the center asks its patients about their planned

---

[3] Moreover, we note that Molina did try to schedule another visit with Clay, but she failed to keep the appointment.

230

post-termination contraception, it must therefore contemplate the issue of possible future pregnancies.

This argument is without merit. On Clay's SurgiCenter counseling form next to the line that reads "birth control method OCS" (oral contraceptive), the SurgiCenter employee wrote "follow up ob/gyn." Malloy testified that this notation meant that when asked, Clay said she would obtain birth control information from her own doctor and did not seek it from the facility. Contrary to Clay's contention, asking the question does not create a duty to counsel in this context. The trial court did not err in granting summary judgment to Atlanta SurgiCenter.

*Judgment affirmed. Johnson, P. J., and Mikell, J., concur. Miller, C. J., concurs and concurs specially. Blackburn, P. J., Barnes and Ellington, JJ., concur in part and dissent in part.*

MILLER, Chief Judge, concurring specially.

I fully concur in the majority opinion. While I find that Clay failed to establish that Rippy violated the professional standard of care as set out in Division 1 thereof, I write separately to express my empathy for Clay because a physician unquestionably has a "generalized duty to impart relevant information to a patient concerning his or her medical condition[,]" here the need to take folic acid. *Atlanta Obstetrics & Gynecology Group v. Abelson*, 260 Ga. 711, 715 (398 SE2d 557) (1990). Nevertheless, if a medical malpractice action is to survive summary judgment, it is essential that the supporting expert's affidavit set out a standard of care showing that a duty was owed. Clay was advised to have her pregnancy immediately terminated in the best interest of her unborn child. Clay's expert, however, failed to establish that, at that time, a further duty is owed to the patient, which includes the physician (1) explaining to an upset Clay that she should take a regular dose of folic acid if she planned to have a healthy pregnancy in the future, and (2) advising Clay to return to her physician for a follow-up visit or to see a new ob-gyn for her condition. While perhaps there is an expert who might have testified that the standard of care here included such a duty owing to Clay, her expert did not do so. Accordingly, I am constrained to find that the trial court correctly granted summary judgment in Rippy's favor. *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

BARNES, Judge, concurring in part and dissenting in part.

While I agree that Georgia allows a cause of action for preconception torts, and concur fully and completely in Divisions 2, 3, and 4, I disagree that no genuine issue of material fact exists regarding whether Dr. Rippy committed malpractice by failing to prescribe and

recommend that Clay take four micrograms of folic acid daily before conceiving again. Accordingly, I respectfully dissent to Division 1.

The majority argues that Rippy did not violate his duty of care because he did not know that Clay would fail to return for follow-up care, which is when he would have counseled her thoroughly regarding the need for folic acid. While Rippy said the May 6 visit was not the time to counsel Clay on future pregnancies because she was crying, upset, and faced with a difficult decision to terminate her pregnancy, it was arguably even more forseeable that a 19-year-old, apparently unsophisticated, and very upset woman might not return for a follow-up visit after her pregnancy ended. But when asked whether he would send a letter or make a phone call to Clay regarding the recommendation she take folic acid if he had not told her about it, he responded that he would not, that the obligation to seek further treatment was Clay's alone. He admitted he did not know if Clay were seeing any other physicians, and although he expected her to see someone for an annual checkup, he never told her that because she never returned to him in 1999.

Dr. Rippy also admitted that the standard of care under these circumstances required that he "supply the information [regarding the link between folic acid and NTD] in an understandable way and be complete." While he thought the standard of care did not require him to give her the information on May 4, 1999, the day he discussed Dr. Molina's findings with Clay, he agreed that if he had a patient whom he actually knew did not understand his recommendations his job was to take further steps to make sure she understood them, "as best as possible." Rippy's office notes indicate that Clay called Rippy's office on May 10, 1999, to report that she had made an appointment with Dr. Malloy, and again called or made some sort of contact on May 14, 1999, although Dr. Rippy could not tell from his notes the nature of this contact.

Maternal-fetal care consultant Dr. Molina testified that all obstetricians knew in 1999 that folic acid should be given to all women capable of becoming pregnant to help prevent neural tube defects and that he expected Dr. Rippy to communicate to Clay the link between folic acid and neural tube defects and recommend the supplement. Molina agreed he was "literally thinking about folic acid and future pregnancies" when he saw Clay on May 4, 1999, but did not arrange a follow-up visit to ensure Clay knew about the link because he "assumed that she would have gone back to her OB and gotten that information."

Tia's expert said in his affidavit that in his opinion Rippy failed to exercise the degree of care and skill ordinarily exercised by members of the medical profession generally under the same or similar circumstances, and that his affidavit did not set forth every

criticism regarding Clay's care. He also said that Rippy violated the standard of care by failing to recommend or prescribe folic acid to Clay following the termination of her 1999 pregnancy. While the majority interprets this statement to mean that Rippy's obligation to inform Clay did not arise until after the termination, it could also mean that Rippy's obligation was to tell Clay when she should *take* the supplement — after the termination — instead of when he should *tell her* about it. As the Supreme Court of Georgia recently observed in a slip-and-fall case, factual issues "in general, must be answered by juries as a matter of fact rather than by judges as a matter of law." *American Multi-Cinema v. Brown*, 285 Ga. 442, 445 (679 SE2d 25) (2009). Whether Rippy fulfilled his duty of care to tell Clay about the link between folic acid and neural tube defects at her final visit or could put it off until later is a jury question.

Given the circumstances of this case, where any future unborn child of Ms. Clay was very likely to be afflicted with a severe neural tube defect and it is well-known that taking a daily dose of folic acid would prevent the birth defect, Dr. Rippy had a duty to Ms. Clay, and any future children of hers, to ensure that she knew she must take folic acid as recommended or face the high probability of having another child with these birth defects. Yet Ms. Clay testified that Dr. Rippy never told her about this connection. On the other hand, Dr. Rippy alleges that he did.

Clearly, this case is not "plain and undisputed." After reviewing the record, I think that a jury question exists as to whether Dr. Rippy should reasonably have known and it was reasonably foreseeable that a 19-year-old woman whose first pregnancy was afflicted by a preventable neural tube defect might become pregnant again and should be advised immediately about the connection between folic acid and birth defects. Although Dr. Rippy contends that he advised Ms. Clay of this connection, she denied that he did so. Thus, a jury should resolve the issue, and I dissent to Division 1 affirming the grant of summary judgment to Rippy and his practice.

I am authorized to state that Presiding Judge Blackburn and Judge Ellington join in this opinion.

DECIDED JULY 16, 2009.

*Harris, Penn & Lowry, Jed D. Manton*, for appellants.
*Huff, Powell & Bailey, Michael S. Bailey, Julye M. Johns, Owen, Gleaton, Egan, Jones & Sweeney, H. Andrew Owen, Jr., Shannon C. Shipley, Hall, Booth, Smith & Slover, Terrell W. Benton III, Kevin A.*

*Leipow, Carlock, Copeland & Stair, Rebecca C. Wall*, for appellees.