**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and MERCIER, JJ.**

**NOTICE: Motions for reconsideration must be**
**_physically received_ in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 30, 2017**

# In the Court of Appeals of Georgia

A17A0736, A17A0737. ROBERTS et al. v. QUICK RX DRUGS,
    INC.; and vice versa.

McMILLIAN, Judge.

These cross-appeals arise from injuries that Bryant Roberts and his wife, Lynn

Roberts, suffered after Bryant[1] ingested improperly dispensed medication, allegedly

causing him to suffer a fall. In Case No. A17A0736, the Robertses assert that the trial

court erred in granting summary judgment to Quick Rx Drugs, Inc. ("Quick Rx") on

their claims for professional negligence/malpractice and punitive damages. They also

assert that the trial court erred in granting summary judgment on an issue that was not

presented in the case: whether Bryant's preexisting Alzheimer's disease was caused

by the improperly dispensed medication and subsequent fall. In Case No. A17A0737,

---

[1] For the sake of clarity, we will refer to the Robertses individually by their first
names.

Quick Rx cross-appeals the trial court's denial of their motion for summary judgment on the issue of proximate cause.

It is well settled that

[s]ummary judgments enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56 (c) have been met. In our de novo review of the grant [or denial] of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant.

(Citations and punctuation omitted.) *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010).

Viewed in that light, the evidence shows that Bryant had been diagnosed with a number of conditions including Alzheimer's disease, diabetes, and high blood pressure, and he was prescribed various medicines as part of his treatment. On or about August 26, 2010, when Lynn dropped off two prescriptions for Bryant at Quick Rx's drive-through window, the cashier told her that she had prescriptions ready for pick up. Lynn took the bag handed to her, signed a credit card slip, and drove away. The bag contained two prescription bottles, one containing 1 mg Xanax pills and the other containing 100 mg Zoloft pills, medications that were prescribed and intended

for another patient with the last name of Roberts, but not for Bryant.[2] The prescription bottles were labeled with the name of this other person and not Bryant's name.

The next night, at around 11:00 p.m., Lynn administered 200 mg of Zoloft and 1 mg of Xanax to Bryant. At approximately 4:00 a.m., Lynn heard Bryant calling her name and discovered him on the floor near the front door of their house (the "Fall"). Lynn saw nothing around the area that could have constituted a trip hazard or accounted for Bryant's Fall. Bryant appeared confused and was unable to get up, prompting Lynn to summon an ambulance. At the hospital, Bryant was diagnosed with a hip fracture, which required emergency surgery.

The Robertses filed this action against Quick Rx, asserting claims for professional negligence, simple negligence, malpractice, loss of consortium, and punitive damages. Quick Rx moved for summary judgment on all these claims , and the trial court granted the motion as to the Robertses' claims for professional negligence/malpractice and punitive damages. The trial court also determined that the Robertses had failed to present evidence to raise a jury issue as to whether Bryant's diagnosis of Alzheimer's was caused by the improper medications or the Fall.

---

[2] At the time of this exchange, the cashier, unbeknownst to either Quick Rx or her, may have been suffering from the effects of an undiagnosed brain tumor. The cashier's condition was diagnosed approximately one month later.

1. In their appeal, the Robertses first assert that the trial court erred in granting summary judgment to Quick Rx on their claims of professional negligence/ malpractice.

"Not every suit which calls into question the conduct of one who happens to be a medical professional is a medical malpractice action. We must look to the substance of an action against a medical professional in determining whether the action is one for professional or simple negligence." (Citation and punctuation omitted.) *Carter v. Cornwell*, 338 Ga. App. 662, 666 (791 SE2d 447) (2016). The determination of whether a complaint asserts a claim of malpractice presents a question of law for the court. *Piedmont Hosp., Inc. v. D. M.*, 335 Ga. App. 442, 445 (2) (779 SE2d 36) (2015). In order to assert a claim of professional malpractice in this case, the Robertses must show (1) the duty owed by the pharmacist to the patient, (2) a breach of that duty based on the failure to exercise the requisite degree of skill and care, and (3) the failure proximately caused the injury sustained. *Clay v. Rippy*, 299 Ga. App. 224, 227 (682 SE2d 330) (2009). A malpractice claim requires expert testimony because

the court and the jury must have a standard measure which they are to use in measuring the acts of the professional in determining whether he exercised a reasonable degree of care and skill in carrying out his professional duties. The proper standard of measurement is to be established by testimony of professionals; for it is a professional question.

*Hopkinson v. Labovitz*, 231 Ga. App. 557, 559 (499 SE2d 338) (1998).

The Robertses rely on the expert testimony of Sherman Weaver, Pharm.D., who testified that the applicable standard of care in this case requires that an offer of pharmaceutical counseling be made every time a patient picks up a prescription and that part of this counseling duty is "to make sure that you have the right patient and the right drug." The standard for pharmaceutical counseling in Georgia is codified at OCGA § 26-4-85. That statute provides, with certain exceptions not applicable here, that

> [u]pon receipt of a prescription drug order and following a review of the patient's record, the pharmacist or the pharmacy intern operating under the direct supervision of the pharmacist shall personally offer to discuss matters which will enhance or optimize drug therapy with each patient or caregiver of such a patient.

OCGA § 26-4-85 (b). However, counseling is not required "when the patient or the caregiver of the patient refuses such consultation or counseling." OCGA § 26-4-85 (e). Weaver explained that the standard of care requires that an offer of counseling be made every time medication is dispensed,[3] but he acknowledged that it allows a pharmacist to delegate to a pharmacy technician or cashier the responsibility to make that offer.

Although Weaver identified this counseling duty as the applicable standard of care in this case, he conceded that he did not know whether counseling was offered to Lynn or whether any counseling occurred. Further, because the pharmacist was not personally required to offer counseling, he admitted that he could not state that the dispensing pharmacist personally violated the standard. Nevertheless, he opined that the standard had been violated because Lynn left with the wrong prescription and that the pharmacist has responsibility for everything that happens in the pharmacy. He

---

[3] Although the expert testified that this standard of care applies every time someone picks up a prescription, even a refill prescription, we note that under regulations promulgated by the Georgia State Board of Pharmacy, an offer of counseling is not required for "refills of prescription drug orders for which, in the professional judgment of the Pharmacist, appropriate counseling has taken place or has been declined. The need for counseling on refills resides in the professional judgment of the dispensing Pharmacist." Ga. Comp. R. & Regs. 480-31-.01 (c) (3) (iv).

6

stated that the standard of care required that pharmacy employees take steps, such as confirming an address or a birth date, to ascertain that the medicine is going to the right person. Therefore, he asserted that delivery of the wrong medication amounted to a violation of the pharmaceutical standard of care in and of itself.

Nevertheless, Weaver agreed that he had no information to show a violation by any Quick Rx employee of the standard of care in counting, filling, labeling the prescriptions, or providing printed drug information along with it. Moreover, he had no knowledge of Quick Rx's policies and procedures, which may include policies or procedures addressing the offer of counseling, and thus he does not know whether any policies and procedures were violated. The expert's sole criticism of Quick Rx was that the wrong medication was dispensed and, therefore, something must have gone wrong, although he did not know what. As he explained, "All we know is that an error occurred[.]"

We agree with the trial court that the Robertses cannot assert a claim for medical malpractice based on this testimony. Weaver opined that Quick Rx breached the duty to offer counseling, but the Robertses have not pointed us to any evidence in the record establishing that the Quick Rx employees failed to make the requisite offer. The record is simply silent on that point. See *Chamblin v. K-Mart Corp.*, 272

Ga. App. 240, 244 (1) (612 SE2d 25) (2005) (summary judgment for pharmacy affirmed on claim of breach of duty to warn/offer counseling where record contained no evidence establishing that pharmacy employees did not make an offer to counsel). Therefore, the expert could only point to the fact that the cashier gave Lynn medicine intended for someone else. Although he asserted that the cited standard of care includes the obligation to take certain steps to ensure that the right customer is receiving the right medicine, the methods he cited for accomplishing this objective do not require professional expertise.

Only where the allegations of negligence against the professional involve the exercise of professional skill and judgment within the professional's area of expertise does the claim sound in professional negligence. *Bardo v. Liss*, 273 Ga. App. 103, 104 (1) (614 SE2d 101) (2005). For example, in medical malpractice actions,

> [t]he resolution of whether an act or omission sounds in simple negligence or medical malpractice depends on whether the conduct, even if supervisory or administrative, involved a medical judgment. "Medical judgments" are decisions which normally require the evaluation of the medical condition of a particular patient and, therefore, the application of professional knowledge, skill, and experience.

(Citation omitted.) *Carter*, 338 Ga. App. at 663.

8

Therefore, "there are instances in which actions performed by or under the supervision of a professional are nevertheless not professional acts constituting professional malpractice, but, rather, are acts of simple negligence which would not require proof by expert evidence." *Kneip v. Southern Eng. Co.*, 260 Ga. 409, 410 (3) (395 SE2d 809) (1990). "The rule is that administrative, clerical, or routine acts demanding no special expertise fall in the realm of simple negligence rather than medical malpractice." (Citation and punctuation omitted.) *Deen v. Stevens*, 287 Ga. 597, 610 (3) (698 SE2d 321) (2010). See also *Dent v. Memorial Hosp. of Adel*, 270 Ga. 316, 318 (509 SE2d 908) (1998) (nurses' failure to activate alarm, as doctor ordered, act of simple negligence); *Lamb v. Candler Gen. Hosp., Inc.*, 262 Ga. 70, 71 (1) (413 SE2d 720) (1992) (failure to replace disposable parts in medical instrument, as necessary for its safe operation, created issue of simple negligence by hospital employees).

Applying these standards, we find that the cashier's act in handing Lynn the wrong medicine, whether or not she took any steps to confirm Lynn's identity as the proper recipient, raises an issue of simple negligence and not professional malpractice. Moreover, the Robertses' claimed damages arose from this dispensing error alone and not from any other alleged act of negligence on the part of Quick Rx

9

or its pharmacists that would implicate professional judgment. But see *Stafford-Fox v. Jenkins*, 282 Ga. App. 667, 672 (639 SE2d 610) (2006) (claim for medical malpractice asserted where the medical staff's negligent failure to convey lab reports and other documents to the doctor caused him to misdiagnose plaintiff's condition and the alleged damages arose from the misdiagnosis); *Baskette v. Atlanta Center for Reproductive Medicine, LLC*, 285 Ga. App. 876, 880-881 (648 SE2d 100) (2007) (malpractice claim based on doctor's decision to employ one fertility treatment over others, which depleted the entire supply of stored sperm on the first attempt, even though staff had failed to note that no other sperm would be available).

Accordingly, the evidence raises a question of simple negligence only, and the trial court properly granted summary judgment to Quick Rx on the Robertses' professional negligence/malpractice claim.

2. The Robertses also claim error in the trial court's grant of summary judgment on their claim for punitive damages.

Punitive damages may be recovered where a plaintiff establishes by clear and convincing evidence that "the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." OCGA § 51-12-5.1 (b). In

10

support of their punitive damage claim, the Robertses cite Weaver's testimony asserting that "[a] person should never leave a pharmacy with the wrong prescription . . . ," noting that Quick Rx failed to perform the proper reconciliation to prevent that from happening and opining that the pharmacy "committed an error of commission [by] giving the wrong prescription to a patient, which could have been caused by an error of omission, which is to engage a person about the name on the prescription."

This testimony, however, is simply a reiteration that an error occurred and a supposition that the error could have been based on a failure to follow certain steps to confirm that the name on the prescription corresponded with the person retrieving the medication. Without more, this evidence presents, at most, a claim for negligence,[4] which is not sufficient to support a claim for punitive damages. "Something more than the mere commission of a tort is necessary for the imposition of punitive damages." *MDC Blackshear, LLC v. Littell*, 273 Ga. 169, 173 (4) (537 SE2d 356) (2000). Therefore, "[m]ere negligence, although gross, will not alone authorize the recovery of punitive damages. There must be circumstances of

---

[4] The lack of evidence supporting a claim of anything beyond negligence is exemplified by Robertses' counsel's argument at the summary judgment hearing, stating "[e]xactly why they violated the standard of care, I don't know. It's irrelevant. It only matters that Quick Rx mistakenly, negligently and illegally gave another patient's medication to Lynn Roberts."

11

aggravation or outrage." (Citation omitted.) *Western Indus., Inc. v. Poole*, 280 Ga. App. 378, 380 (1) (634 SE2d 118) (2006). See also OCGA § 51-12-5.1. Because the Robertses have failed to point to any evidence in the record upon which a jury could properly base an award of punitive damages, the trial court properly granted summary judgment on that claim.

3. The Robertses next assert that the trial court erred in granting summary judgment on a claim that the medication caused Bryant to develop Alzheimer's disease, because they never asserted such a claim.

The Robertses alleged in their complaint that in August 2010, Bryant had been diagnosed and was receiving treatment for, inter alia, early-onset Alzheimer's disease and that the Fall "led directly to . . . the rapid acceleration" of that disease. However, Lynn asserted in her deposition that she had no knowledge prior to the Fall that Bryant had been diagnosed with Alzheimer's disease or senile dementia, and she did not learn of any such diagnosis until months afterwards. When asked whether she believed that her husband's advanced Alzheimer's condition was caused by the Xanax and the Zoloft, she replied, "I believe that was the beginning of it and then after you get put to sleep [in surgery] it speeds dementia up."

12

In the brief supporting its motion for summary judgment, Quick Rx argued that the record did not support a claim that the administration of the two medications and the Fall caused Bryant's Alzheimer's disease. The Robertses did not address this contention directly in their response to the motion, but they cited their medical expert's opinion that "the rapid deterioration of [] Bryant's cognitive abilities since December 2010 is more likely than not related to the major injuries he suffered" in the Fall and a subsequent fall, describing this as a crucial aspect of their case.

"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." OCGA § 9-11-15 (b). And "it is well settled that the trial court may exercise its authority to amend under OCGA § 9-11-15 (b) on motion for summary judgment." *Pew v. One Buckhead Loop Condo. Assn., Inc.*, 305 Ga. App. 456, 458 (1) (a) (700 SE2d 831) (2010). "The trial court has always had wide discretion to allow an amendment, and unless there is a manifest abuse of that discretion, this Court declines to interfere." *Kace Investments, L.P. v. Hull*, 278 Ga. App. 477, 481 (1) (a) (629 SE2d 26) (2006).

Although the Robertses' complaint did not allege that the drugs and the Fall caused Bryant's Alzheimer's disease, Lynn's testimony suggested such a claim. And

13

in response to Quick Rx's motion for summary judgment on this issue, the Robertses failed to inform the trial court that they were not, in fact, raising that claim. To the contrary, their characterization of their expert's testimony left open the possibility that they were. Moreover, the Robertses have not demonstrated that they were prejudiced by this ruling, as it does not limit their ability to argue that the administration of the Xanax and the Fall accelerated Bryant's pre-existing Alzheimer's disease, even if they did not cause the condition, which apparently is the claim that they intended to pursue. *Pew*, 305 Ga. App. at 459 (1) (a). Therefore, we find the trial court did not abuse its discretion in ruling on this issue.

*Case No. A17A0737*

4. In its cross-appeal, Quick-Rx argues that the trial court abused its discretion in denying the pharmacy's motion for summary judgment on the issue of causation, asserting that the Robertses' theory as to the cause of the Fall lacks factual support; their theory as to the cause of the Fall is not properly applied to the facts; their expert's causation test is scientifically unreliable; and the mere fact of the Fall proves nothing.

14

"[T]he question of whether an expert witness has stated a proper basis for expressing an opinion is for the trial court[.]"[5] (Citation and punctuation omitted.) *Firmani v. Dar-Court Builders, LLC*, 339 Ga. App. 413, 422 (3) (793 SE2d 596) (2016). And "an appellate court is to uphold the trial court's decision on the admission of such evidence, absent an abuse of the trial court's discretion." *Yugueros v. Robles*, 300 Ga. 58, 67 (793 SE2d 42) (2016).

In Georgia, the admission of expert testimony is governed by OCGA § 24-7-702 (b), which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if: (1) The testimony is based upon sufficient facts or data; (2) The testimony is the product of reliable principles and methods; and (3) The witness has applied the principles and methods reliably to the facts of

---

[5] Ordinarily, appellate courts do not address the admissibility of expert testimony in the context of a motion for summary judgment. See *Toyo Tire North America Mfg., Inc. v. Davis*, 299 Ga. 155, 159-60 (787 SE2d 171) (2016). However, the trial court treated Quick Rx's argument on the issue of causation as encompassing a motion to exclude expert testimony under OCGA § 24-7-702 and expressly found the testimony to be admissible under that statute. Therefore, we will address that ruling on appeal.

the case which have been or will be admitted into evidence before the trier of fact.

OCGA § 24-7-702 (b). As our Supreme Court has explained, this statute "requires a trial court to sit as a gatekeeper and assess the reliability of proposed expert testimony" before admitting it into evidence. (Citation and punctuation omitted.) *Dubois v. Brantley*, 297 Ga. 575, 580 (2) (775 SE2d 512) (2015).

For issues involving medical expertise, "Georgia case law requires only that an expert state an opinion regarding causation in terms stronger than that of medical possibility, i.e., reasonable medical probability or reasonable medical certainty." *Zwiren v. Thompson*, 276 Ga. 498, 503 (578 SE2d 862) (2003). "[An] expert need not use the magic words 'reasonable degree of medical certainty,' but the facts in the record must be sufficient to meet the legal standard embodied in those 'magic words.'" (Citation omitted.) *Beasley v. Northside Hosp., Inc.*, 289 Ga. App. 685, 689, (658 SE2d 233) (2008). See also *Zwiren*, 276 Ga. at 502. Therefore, "[a] plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough." *Moore v. Singh*, 326 Ga. App. 805, 809 (755 SE2d 319) (2014). See also *Hawkins v. Greenberg*, 166 Ga. App.

16

574, 577 (1) (a) (304 SE2d 922) (1983) (expert's testimony that injury was "most likely" caused by alleged negligence was sufficient).

In support of their claim of causation, the Robertses rely on the testimony of Mark B. Shoag, M.D., a physician certified in the area of internal medicine. Shoag asserted three opinions in this case: (1) it is more likely than not that Bryant's Fall was caused by the mis-prescribed Xanax, because it has a general sedative effect and can worsen the symptoms of Alzheimer's patients, increasing their risk of falls; (2) the weakness and instability resulting from the Fall was more likely than not the primary cause of a second fall in December 2010; and (3) the rapid deterioration of Bryant's cognitive function is more likely than not related to the injuries he sustained in these incidents.

In his deposition, Shoag explained that he had prescribed Xanax to his patients and that he believed that it aggravated the physical manifestations of Alzheimer's. He testified that the 1-mg dose Bryant was given was four times the dose someone new to the drug should have received.[6] Based on this information and the fact that Bryant

_____

[6] Although Shoag reviewed articles from medically recognized sources dealing with Alzheimer's patients breaking hips, he based his testimony primarily on his medical education, knowledge, and experience over a more than 30-year period, particularly his experience with Alzheimer's patients.

17

took a major fall hours after he received that dose, the expert opined that it was more probable than not that without "that Xanax on board, he doesn't take this fall." However, Shoag did not rule out the other medical conditions as contributing factors. Rather, he explained that giving such a large dose to a man in Bryant's condition, i.e., "someone who is unsteady to begin with," would make them extremely unsteady. Therefore, he concluded that "it is certainly likely that those other factors contributed to the fall, but you add to that a milligram of Xanax, I think that's the likely – that's the straw that breaks the camel's back." Although Bryant's medical conditions alone could have possibly led to a fall at some point, he believed it was "much more" probable than not that the combination of those conditions and the Xanax led to the Fall on that particular night. The trial court found Shoag's testimony admissible under the factors set forth in OCGA § 24-7-702. We find no abuse of discretion.

(a) Contrary to Quick Rx's assertions, the Robertses' theory had factual support, is properly applied to the facts, and arises from more than the mere fact of the Fall. Even though Bryant had no clear memory of the Fall and no one else witnessed it, the record demonstrates that at bedtime he was given a "big dose" of Xanax, a medication not prescribed for him, and despite the fact that he was usually a sound sleeper, within hours he uncharacteristically left his bed and ultimately

18

suffered a fall that left him with serious injuries. After the Fall, he was confused and unable to move. Adding the expert's testimony regarding the negative effect of such a dose of Xanax on a man in Bryant's condition and his opinion that it is more probable than not that the medicine in combination with the other factors caused the Fall, we find the evidence was sufficient to create a jury issue on causation. See *Hosp. Auth. of Valdosta/Lowndes County v. Fender*, 342 Ga. App. 13, 21 (1) (802 SE2d 1346) (2017) (jury issue on causation where sonographer's negligence in performing ultrasound was "a link in the chain of incorrect decisions made with regard to [the patient's] treatment") (citation and punctuation omitted); *Renz v. Northside Hosp., Inc.*, 285 Ga. App. 882, 884 (1) (648 SE2d 186) (2007) (expert's testimony that nurse's negligence was a contributing cause of plaintiff's injuries sufficient to withstand summary judgment).

(b) Moreover, we find no abuse of discretion in the trial court's finding that Shoag's testimony was scientifically reliable.

Although Quick Rx asserts that Shoag failed to consider certain information in reaching his opinion,[7] Quick Rx has failed to show how such information

---

[7] Quick Rx asserts that the expert improperly failed to take into account that the Robertses do not know how he fell and the doctors and nurses noted that Bryant was a poor and inaccurate historian. They also assert that the expert mistakenly believed

undercuts the scientific basis for or the admissibility of his testimony; rather, the alleged errors in Shoag's testimony may be addressed in cross-examination. Quick Rx also asserts that the expert failed to correctly implement his differential analysis because he failed to properly rule in Xanax as a cause of the Fall by failing to account for Bryant's prior falls in his analysis. However, Shoag testified that a prior history of falls only made his opinions "all the more so relevant" because a man with such a history is "the last person in the world that you would put on [Xanax]." Moreover, Quick Rx points to no evidence indicating that the prior falls resulted from something other than Bryant's pre-existing medical conditions, which Shoag did account for in his analysis. But see *Hawkins v. Ob-Gyn Assocs., P.A.*, 290 Ga. App. 892, 894 (1) (660 SE2d 835) (2008) (expert's application of differential analysis was flawed where his "assumed cause of injury was not only unsupported by any evidence, but was contrary to all the evidence of record"). Quick Rx also argues that Shoag's methodology was flawed because he failed to rule out Bryant's prior medical conditions as a cause of the Fall, but the expert did not assert that the Xanax was the sole cause of the Fall. Rather, he opined that it was a contributing cause, which, in concert with Bryant's medical conditions, resulted in the Fall and Bryant's injuries.

that Bryant fell out while getting out of bed, instead of in another room.

Because he clearly acknowledged that the medical conditions probably played a role, he was not required to rule them out as a contributing cause. Indeed, it would have been inconsistent with his opinion to do so.

Accordingly, the trial court properly found that Shoag's testimony was admissible and that the question of causation was for the jury. See *Rodrigues v. Ga.-Pacific Corp.*, 290 Ga. App. 442, 445 (661 SE2d 141) (2008) (in negligence action, "the plaintiff must present medical expert opinion as to causation which may be aided by other medical or non-medical evidence that, in totality, shows causation, even [if] the medical opinion is weak, i.e., showing a reasonable possibility rather than a probability.") (citation and punctuation omitted); *Saul Klenberg Co. v. Mrozinski*, 78 Ga. App. 59 (50 SE2d 247) (1948) (damages may be recovered for injuries which may not have resulted except for plaintiff's pregnant condition; whether condition was result of car wreck and aggravation of plaintiff's condition by car wreck, or was result of child birth alone was a question for the jury).

*Judgments affirmed. Barnes, P. J., and Mercier, J., concur*.